## AMERICAN BRAKE SHOE & FOUNDRY CO. v. INTERBOROUGH RAPID TRANSIT CO.

District Court, S. D. New York.

June 22, 1936.

Miller, Owen, Otis & Bailey, of New York City (Carl M. Owen, Mark F. Hughes, and Ralph Norton, all of New York City, of counsel), for receiver of Interborough Rapid Transit Co.

Lamar Hardy, U. S. Atty., of New York City (Leon E. Spencer and Malcolm A. Crusius, Asst. U. S. Attys., and Philip Bartedo, Sp. Atty., Treasury Department, all of New York City, of counsel), for the United States.

MACK, Circuit Judge.

The United States filed a proof of claim herein for additional income taxes assessed against the Interborough for the fiscal year ending June 30, 1932, and asserts priority therefor. The receiver's petition recommends that the claim be disallowed or at best allowed only as a general claim. The answer of the government thereto puts in issue each objection to the validity of the assessment raised by the receiver. At the request of both parties, I shall consider only a part of that assessment and only if that be upheld will it be necessary hereafter to consider the other parts. The question for present determination is whether the difference between the par value and repurchase price of certain 5 per cent. Interborough bonds, repurchased in connection with the operation of a sinking fund provided for in article 4 of Interborough's First and Refunding. Mortgage, dated March 20, 1913, was income taxable to Interborough for the year 1932.

Under this article, the trustee under the mortgage, custodian of the sinking fund, had to use moneys paid into the sinking fund for the acquisition of outstanding bonds; furthermore Interborough was required to make semiannual payments into the sinking fund, some in cash and others at its option in cash or in the bonds taken at par.

Section 2 thereof provided that:

"All bonds acquired by the Trustee for the Sinking Fund shall be deemed to remain alive for the purposes of the Sinking Fund, and shall not again be issued, and shall be stamped: 'Not negotiable. Held for Sinking Fund under First and Refunding Mortgage dated March 20, 1913, of Interborough Rapid Transit Company to Guaranty Trust Company of New York'. The Interborough Company shall duly pay to the Trustee the amount of all interest obligations upon all bonds acquired and held for the Sinking Fund as aforesaid, when and as such inter-

est shall respectively become due, upon surrender and cancellation of any coupons representing such interest obligations, and the amounts so received by the Sinking Fund Trustee shall be added to the Sinking Fund and applied as provided in this Section 2."

In the fiscal year ending June 30, 1932, $3,719,000 bonds were brought by the trustee for $2,067,893.80, and $1,325,000 by the Interborough for $1,220,592.17. Subtracting the "Unamortized portion on above 5% Bonds of Debt Discount and Expense," leaves a "Net Difference between cost and par" of $1,742,768.20.

Although the Interborough did not receive full par value for the bonds at the time of their issuance, it has written off the amortized portion of the discount and expense each year as a deduction against earnings. For present purposes, therefore, it is as if the face value of the bonds was received at issuance.

For the year ending June 30, 1932, the Interborough paid and the trustee collected $1,720,775 as interest on the face value of the bonds in the sinking fund which included the interest on the face value of the bonds purchased in that year. In the federal income tax return for that year this interest payment was reported as income, although the full amount so paid was deducted as a corporate charge against revenue. The Interborough's General Balance Sheet of June 30, 1932, shows the entire amount of bonds acquired for the sinking fund as an outstanding liability to their full face value and makes no reduction of that liability on account of the purchase of the bonds below par and a consequent increase in free assets. The bonds acquired for the sinking fund were never physically canceled, but having been stamped as provided in the indenture, were retained by the trustee as custodian of the sinking fund.

Receiver contends that no such profit was realized by Interborough in 1932 as may be considered taxable income.

Section 22(a) of the Revenue Act of 1928, 45 Stat. 797 (26 U.S.C.A. § 22 and note), with which the corresponding section of the Revenue Act of 1932, 47 Stat. 178 (26 U.S.C.A. § 22 and note) is indentical, provides:

"Gross Income. (a) General definition. 'Gross income' includes * * * gains or profits and income derived from any source whatever."

Article 68 of Regulations 74, with which Article 68 of Regulations 77 is identical, reads:

"* * * 3 (c) If, * * * the corporation purchases and retires any of such bonds at a price less than the issuing price plus any amount of discount already deducted, the excess of the issuing price plus any amount of discount already deducted (or of the face value minus any amount of discount not yet deducted) over the purchase price is gain or income for the taxable year."

It is now well settled that this Regulation properly interprets the law. U. S. v. Kirby Lumber Co. (1931) 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131; Helvering v. American Chicle Co. (1934) 291 U.S. 426, 54 S.Ct. 460, 78 L.Ed. 891. Receiver endeavors to distinguish these cases on several grounds, none of which, in my judgment, is tenable. He points out that while the purchase in the Kirby Lumber Co. Case was in the year of issuance here it was some nineteen years thereafter. The Circuit Court of Appeals of this Circuit, however, in Commissioner v. American Chicle Co. (1933) 65 F.(2d) 454, reversed in Helvering v. American Chicle Co., supra, on other grounds, said: "We can see no difference between bonds retired in the same year and later." See, too, Commissioner v. Norfolk Southern R. Co. (C.C.A. 4, 1933) 63 F.(2d) 304, certiorari denied Burnet v. Norfolk Southern R. Co. (1933) 290 U.S. 672, 54 S.Ct. 91, 78 L.Ed. 580 (bonds retired at least six years subsequent to issuance); Montana, Wyoming and Southern R. Co. v. Commissioner (C.C.A. 3, 1935) 77 F.(2d) 1007 (bonds issued in 1909 and purchased in 1930).

He further urges that there the purchases were voluntary, while here they were compulsory pursuant to the sinking fund provisions. But as to Interborough purchases, there was no compulsion; it exercised an option in lieu of making a cash payment into the sinking fund. The purchase by the trustee was compulsory under the sinking fund provisions. But this fact is of no significance; the results were identical. The Interborough in both cases benefited to the extent of the difference between the face value of the bonds and the purchase price. A similar situation was presented in Helvering v. American Chicle Co., supra. Although the point now raised does not seem to have been specifically argued by counsel for the taxpayer in that

case, the court said (291 U.S. 426, at page 430, 54 S.Ct. 460, 461, 78 L.Ed. 891): "We find nothing to distinguish this cause in principle from United States v. Kirby Lumber Co., 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131. The doctrine there announced is controlling here."

As to the further contention that there can be no retirement within the Regulation, without physical cancellation of the bonds, I agree with the contrary conclusion reached in several cases. In Garland Coal & Mining Co. v. Helvering (1934) 64 App.D.C. 144, 75 F.(2d) 663, a corporation had purchased its own bonds in 1928 at a price less than their original issuing price and thereafter held them in its treasury until the following year, at which time they were delivered to the trustee for cancellation and were then canceled. The question was whether or not it had realized taxable income in the year of purchase. The Board of Tax Appeals (Garland Coal & Mining Co. v. Commissioner, 28 B.T.A. 348) said:

"In the instant proceeding it is our opinion that the bonds in question were 'retired' in 1928 within the meaning of the regulations, despite the fact that they were not actually turned over to the trustee and canceled until 1929.

"The word 'retire' is defined in Webster's New International Dictionary, 1929, as 'To withdraw from circulation, or from the market, to take up or pay; as, to retire bonds; to retire a note.'

"In the instant proceeding the bonds in question were, in 1928, certainly withdrawn from circulation and taken up and paid for all practical purposes as between the holders of the bonds and the petitioner. If the regulations were construed to mean that bonds must be completely canceled before gain or loss is recognized, then, in our opinion, such regulations would not correctly interpret the law."

In affirming the action of the Board, the court said [64 App.D.C. 144, 75 F.(2d) 663, at page 664]:

"And so, in this case the question is, the intention of petitioner when it redeemed its bonds. And this, from all that appears was clearly, as we think, to pay the bonds and retire them, for that is actually what did happen, and there is not a word of evidence to show a different or contrary intention at any other time. The fact that the intention was also to postpone actual surrender and cancellation to a subsequent year, rather than the year of the purchase, does not affect the question; nor keep the bonds alive. In short, if the acquisition of the bonds from the holder was for the purpose of paying the debt, there could not at the same time be an intention to keep the debt alive, and without that intention the transaction was a completed one and the bonds, even though held in the treasury, were not subject to reissue, and were as much 'retired' as if they were actually surrendered and marked 'cancelled.' * * *

"Enough appears to convince us beyond any reasonable doubt that when petitioner purchased the $100,000 of bonds, it purchased them for cancellation and retirement and not for the purpose of keeping them alive for reissue, and the mere fact that it held them in its treasury until the commencement of the next year does not, in the absence of evidence of a clear intention to hold them for investment, militate against this conclusion."

In Montana, Wyoming & Southern R. Co. v. Commissioner, supra, the bonds purchased some five years before had not as yet been canceled. The court, however, said: "While it has not surrendered such bonds to the trustee for cancellation, it still owns them, and by its purchase has proportionately paid such part of its indebtedness."

In my judgment, the mere fact that the bonds in the instant case have not been and will not for years be physically canceled is not inconsistent with their having been retired, within the intendment of the Regulation. Under article 4 of the mortgage, they became nonnegotiable; they could not be reissued. They were to be held until all outstanding bonds had been redeemed at which time they were all to be canceled. The true nature of the transaction was a liquidation of the indebtedness. It is immaterial in the light of the prohibition against reissuance that the balance sheet of the Interborough for 1932 carried all the bonds as an outstanding liability. Only in an ambiguous situation could the accounting practice be of weight in showing the intention of the taxpayer. While in the Garland Coal & Mining Co. Case, supra, one of the facts relied upon by the court was that the taxpayer, in its balance sheet filed with its income tax return for the year of the purchase, subtracted the face value of the bonds purchased from its previous bonded liability, in the Montana, Wyoming & Southern R.

Co. case, supra, the taxpayer continued to carry the purchased bonds on its books under the caption "Investments and Securities Issued" and made no adjustment reducing the amount of the outstanding bonds to the extent of the purchase.

Although the mortgage provides that the bonds "shall be deemed to remain alive for the purposes of the Sinking Fund," I cannot regard such a narrowed existence, even in conjunction with the Interborough's continued obligation to make what are called interest payments to the trustee on all unmatured coupons, as meeting the test laid down in the Garland Coal & Mining Co. Case with which I am fully in accord, to the effect that, "Undoubtedly, a corporation may purchase its own bonds as an investment and reissue them, but in such a case the intention to keep the indebtedness alive must be clearly shown, for the general rule is that where an indebtedness is in fact paid, the evidences of it cannot be reissued for a new or different debt."

Such continued life as the purchased bonds were assumed to have was merely for the purpose of determining the time and extent of additional payments to be made into the sinking fund. This was not true interest; it was but the measure used to fix the amount of such additional payments.

I therefore hold that the assessment of the Commissioner, in so far as it determines that a taxable gain resulted from the purchases of 1932, is correct. I note that there is a discrepancy of some $22,745.83 between the net difference between cost and par as determined by the receiver and by the government. The former sets forth the sum as $1,742,768.20 and the latter as $1,765,514.03. I have not meant by my present decision to pass any judgment on the mathematical correctness of either computation. I have merely considered the legal question. If there has been mere error in computation by either party, the matter can be adjusted out of court. If the cause of the discrepancy be some other substantial dispute, I will have to resolve it at a further hearing.

It now becomes necessary, in the light of this decision, to have a determination of the March 1, 1913, value of contracts Nos. 1 and 2 leases concerning which the parties are in substantial dispute. After a formal amendment of receiver's petition as was agreed at the argument shall have been filed, a reference may be had on this and any further questions.