## COMMISSIONER OF INTERNAL REVENUE v. PITTSBURGH & W. V. RY. CO.
### No. 9632.

United States Court of Appeals
Third Circuit.

Argued Nov. 1, 1948.
Decided Feb. 9, 1949.

S. Dee Hanson, of Washington, D. C. (Theron Lamar Caudle, Asst. Atty. Gen., and Sewall Key and George A. Stinson, Sp. Assts. to Atty. Gen., on the brief), for petitioner.

Norman D. Keller, of Pittsburgh, Pa. (W. A. Seifert and Reed, Smith, Shaw & McClay, all of Pittsburgh, Pa., on the brief), for respondent.

Before BIGGS, Chief Judge, and McLAUGHLIN and KALODNER, Circuit Judges.

KALODNER, Circuit Judge.

This appeal is taken from the decision of the Tax Court.

The single question presented is whether the taxpayer realized taxable income in the taxable years 1941 and 1942 when it purchased in the open market its own first mortgage bonds at a cost less than the issue price and immediately, pursuant to its covenants in a junior trust indenture, deposited and pledged the purchased bonds with the trustee as additional collateral to the junior note issue.

The facts as found by the Tax Court[1] may be summarized as follows:

The taxpayer is a corporation, organized under the laws of Pennsylvania and West Virginia for the purpose of operating a steam railroad. Its principal office is in Pittsburgh. Its tax returns for the year involved were filed with the Collector for the Twenty-Third District of Pennsylvania.

On July 1, 1940, the taxpayer borrowed $7,400,000 and issued its five-year 4% notes in such amount, secured by an indenture dated July 1, 1940, between the taxpayer and First National Bank at Pittsburgh, as trustee.

Under the terms of the indenture, the taxpayer was required during the calendar year 1941 to devote not less than 25% of its "Available Net Income" for 1940, and during each calendar year thereafter, so long as any of the notes were outstanding and unpaid, not less than 50% of its "Available Net Income" for the preceding year "to the purchase at the lowest price or prices available in the open market but not exceeding the principal amounts thereof" of its then outstanding series A, B, and C first mortgage 4½% bonds, "and the Company (taxpayer) covenants and agrees that any and all of such bonds so purchased by the Company shall remain alive and forthwith be delivered to and pledged with the Trustee to be held by the Trustee as Pledged Securities under and subject to the terms of this Indenture."

If any described event of default were to occur, the trustee was given discretion to convert into money at public sale any of the pledged securities.

Pursuant to the provisions of the indenture, the taxpayer, in the year 1941, purchased $550,000 face value of its series A, B, and C first mortgage 4½% bonds for the sum of $349,220, and in the year 1942 purchased $282,000 face value of such bonds for the sum of $159,271.25, and immediately upon such purchases delivered the bonds so purchased to, and pledged them with, the bank as trustee under the indenture. The bonds remained pledged with the trustee until June 28, 1945, when they were returned to the taxpayer by the trustee upon the payment of the taxpayer's five-year 4% notes.

The bonds were secured by an indenture of mortgage and supplemental indentures between the taxpayer and the Union Trust Company of Cleveland, Ohio, and Robert S. Crawford, as trustees, dated December 1, 1928, April 1, 1929, April 30, 1929, and April 1, 1930, covering all properties owned or which would subsequently be acquired by the taxpayer, except cash, accounts receivable, bills receivable, stocks, bonds, notes, and similar intangible property and such of the real estate of the taxpayer as is not included within its rights-of-way and real estate upon which no structures used for railroad purposes are located, and engines, tenders, cars, and other rolling stock.

The Commissioner included in the taxpayer's gross income for the years 1941 and 1942 the difference between the face value and the purchase price of its bonds purchased and pledged by the taxpayer as aforesaid.

The Tax Court reversed the Commissioner's determination stating that it subscribed to the taxpayer's contention that the obligation embodied in the repurchased bonds "remained alive in the hands of another and was not extinguished until June, 1945 when the five-year notes were paid." It further held that the taxpayer "did not, in reality, obtain a cancellation of its debt in the instant years"; that "it did not effectively free any part of the mortgaged assets from the continuing lien of the bonds," and, "it could not be said with certainty at that time that, if the pledged bonds had to be resold, the entire transaction might not result in a loss."

The Commissioner urges that the Tax Court's disposition was not in accordance with the provisions of Section 22(a) of the Internal Revenue Code[2]; the pertinent

[1] The findings of fact and opinion of the Tax Court are reported in 9 T.C. 268.

[2] "§ 22. Gross Income

"(a) [as amended by Sec. 1 of the Public Salary Act of 1939, c. 59, 53 Stat.

574] General Definition. 'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service * * * of whatever kind and in whatever form paid,

Treasury Regulations[3]; and the authorities. He contends that the realization of taxable gains was not precluded in the taxable years by the taxpayer's pledging the purchased bonds as security for the then outstanding five-year note issue; that upon their repurchase the bonds became the taxpayer's property even though pledged, and thereafter its liability thereon was only contingent, its unconditional obligation on the bonds having been extinguished upon repurchase; and that upon the latter, the assets were thereby freed to the extent of the extinguished unconditional obligation, and in turn superimposed with only the separate and distinct liability upon the pledging of the bonds.

Finally, the Commissioner asserts that under the Amended Treasury Regulations and the decisions, the failure to retire or cancel the bonds immediately after their repurchase is immaterial and that for tax purposes the pledging of the bonds was a transaction separate and independent from the one involving their repurchase at a discount.

The taxpayer's position is, in sum, that it actually derived no taxable income in the years 1941 and 1942 from the purchase of its bonds at a discount since they were required to be and were, immediately pledged

as additional security for the outstanding notes and that consequently the taxpayer's assets did not become available for its use freed from the obligation of the bonds.

The taxpayer concedes the general rule that income is realized by the purchase of one's obligations at less than their face value or issue price. United States v. Kirby Lumber Co., 1931, 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131; Helvering v. American Chicle Co., 1934, 291 U.S. 426, 431, 54 S.Ct. 460, 78 L.Ed. 891; Commissioner v. Jacobson, 69 S.Ct. 358. It contends, however, that the principle becomes applicable only when the obligation of the repurchased bonds is *extinguished* thereby *freeing* the assets securing the bonds. Here, it urges, the obligation of the bonds was not *extinguished* until the five-year notes were paid and it was only on such payment that the assets securing the bonds were *freed*.

We cannot subscribe to the taxpayer's view.

Taxability, where the taxpayer purchases its own obligations at a discount, is based "on the increase in net assets which resulted." Helvering v. American Dental Co., 1943, 318 U.S. 322, 327, 63 S.Ct. 577, 580, 87 L.Ed. 785. The increase in net assets constitutes taxable income in the year in which the transaction takes place.[4]

---

or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *" 26 U.S.C.A. § 22(a).

[3] Treasury Regulations 103, promulgated under the Internal Revenue Code: "Sec. 19.22 (a)-14. Cancellation of indebtedness.—(a) In general.—The cancellation of indebtedness, in whole or in part, may result in the realization of income. * * * A taxpayer realizes income by the payment or purchase of his obligations at less than their face value. (See Section 19.22(a)-18. * * *

"Sec. 19.22(a)-18. Sale and purchase by corporation of its bonds.—(1) (a) If bonds are issued by a corporation at their face value, the corporation realizes no gain or loss. (b) If the corporation pur-

chases any of such bonds at a price in excess of the issuing price or face value, the excess of the purchase price over the issuing price or face value is a deductible expense for the taxable year. (c) If, however, the corporation purchases any of such bonds at a price less than the issuing price or face value, the excess of the issuing price or face value over the purchase price is gain or income for the taxable year."

* * * * * *

Sections 29.22(a)-13 and 29.22(a)-17 of Treasury Regulations 111, promulgated under the Internal Revenue Code, applicable to the year 1942 herein, contained provisions identical with those of Sections 19.22(a)-14 and 19.22(a)-18, respectively, above quoted.

[4] Except as affected by the provisions of Section 22(b) (9) which excludes such income from the ordinary income taxes for the taxable year provided that the taxpayer makes and files at the time of filing the return its consent to Treasury Regulations 103 which in turn provide a comprehensive procedure for decreasing

The simple test to be applied in determining the existence of taxable income is whether there was simultaneously "a decrease of liabilities with corresponding increase of net assets," by reason of the purchase of ones outstanding obligations at a discount. Helvering v. American Chicle Co., supra; Central Paper Co. v. Commissioner of Internal Revenue, 6 Cir., 1946, 158 F.2d 131, 133.

It was the Kirby case which originally established the principle that on the repurchase of one's own obligations at a discount there is "* * * an accession to income, if we take words in the plain popular meaning, as they should be taken here" [284 U.S. 1, 52 S.Ct. 4], and that the reduction of a liability is a separate transaction which immeditely creates taxable income during the year in which it takes place.

Thus here, the taxpayer's contention, to which the Tax Court subscribed, that ascertainment of the fact whether taxable income had been derived from the repurchase of the bonds would have to await the outcome of the pledging transaction with the note indenture trustee, is at variance with the established rule.

In Burnet v. Sanford & Brooks Co., 1931, 282 U.S. 359 at page 363, 51 S.Ct. 150, 151, 75 L.Ed. 383,[5] the Court said:

"All the revenue acts which have been enacted since the adoption of the Sixteenth Amendment have uniformly assessed the tax on the basis of annual returns showing the net result of all the taxpayer's transactions during a fixed accounting period, either the calendar year, or, at the option of the taxpayer, the particular fiscal year which he may adopt. * * *"

And 282 U.S. at pages 364–365, 51 S.Ct. at page 152, 75 L.Ed. 383:

"A taxpayer may be in receipt of net income in one year and not in another. The net result of the two years, if combined in a single taxable period, might still be a loss; but it has never been supposed that that fact would relieve him from a tax on the first, or that it affords any reason for postponing the assessment of the tax until the end of a lifetime, or for some other indefinite period, to ascertain more precisely whether the final outcome of the period, or of a given transaction, will be a gain or a loss.

"The Sixteenth Amendment was adopted to enable the government to raise revenue by taxation. It is the essence of any system of taxation that it should produce revenue ascertainable, and payable to the government, at regular intervals. Only by such a system is it practicable to produce a regular flow of income and apply methods of accounting, assessment, and collection capable of practical operation. * * *"

Additional well-settled principles, applicable to the case sub judice, are: "The broad sweep of this language (in Section 22(a)) indicates the purpose of Congress to use the full measure of its taxing power * * *"[6]; "The income taxed is described in sweeping terms and should be broadly construed in accordance with an obvious

---

the cost or other basis of a taxpaying corporation's properties as a condition of its taking advantage of Section 22(b)(9). Since the taxpayer in the instant case did not invoke the provisions of this section we are not concerned with it here.

[5] In the Burnet case the taxpayer from 1913 to 1915 was engaged in carrying out a dredging contract for the United States. In making its income tax returns for the years 1913 to 1916, the taxpayer added to gross income for each year the payments made under the contract that year, and deducted its expenses paid that year in performing the contract. The total expenses exceeded the payments received by approximately $176,000. The tax returns for 1913, 1915 and 1916 showed net losses; that for 1914 showed net income. In 1915 work under the contract was abandoned and in 1916 suit was brought in the Court of Claims to recover for a breach of warranty of the character of the material to be dredged. In 1920, as a result of that suit, the taxpayer received approximately $192,500 which represented the approximate $176,000 loss previously referred to and accrued interest. The taxpayer failed to include the sum recovered in its tax return for 1920 and the Commissioner made a deficiency assessment based on such failure. The Supreme Court sustained the action of the Commissioner.

[6] Helvering v. Clifford, 1940, 309 U.S. 331, 334, 60 S.Ct. 554, 556, 84 L.Ed. 788;

purpose to tax income comprehensively"[7]; and, finally, as we have said, "taxation 'is an intensely practical matter' "; and, it "deals with realities not semblances; with substance not form."[8]

Applying the principles stated to the transactions under review we find:

In 1941, before the taxpayer repurchased $550,000 of its outstanding mortgage bonds it owed that $550,000 to the bondholders plus $7,400,000[9] to the noteholders. After it repurchased the bonds it no longer owed that $550,000 to the bondholders. The subsequent pledging of the $550,000 mortgage bonds with the noteholders' trustee did not again create any new debt—the obligation to the noteholders remained at $7,400,000.

Thus, as a result of the repurchase of the $550,000 mortgage bonds at a discount of $200,780 ($349,220 was paid for the bonds) there was "a decrease of liabilities with corresponding increase of net assets" and the discount constituted taxable income for the year 1941 when the transaction took place:

The same is true of the $282,000 mortgage bonds repurchased in 1942 at a discount of approximately $122,729 ($159,271.25 was paid for the bonds). When these bonds were pledged with the noteholders' trustee the obligation to the noteholders still remained at $7,400,000. And for the reasons stated in connection with the 1941 transaction the discount at which the bonds were repurchased in 1942 constituted taxable income that year.

The foregoing effectively disposes of the taxpayer's argument that "income was not derived and nothing of exchangeable value was received which could be used to pay the tax,"[10] and the Tax Court's determination that "Petitioner (taxpayer) did not, in reality, obtain a *cancellation* of its debt in the instant years * * *"; it did not effectively *free* any part of the mortgaged assets from the continuing lien of the bonds. * * * "[11] (Emphasis supplied)

The crux of the taxpayer's position is that the mortgage bonds "were not purchased with the intention of *retirement* but instead with the intention and obligation to pledge them with the note indenture trustee," [12] and consequently its assets were not *freed* for its use. It is thus evident that the taxpayer considers *retirement* of the bonds as a condition precedent to the *freeing* of the assets which secured them before taxable income can result.

That conception ignores the fact that the Treasury Regulations, beginning with the Revenue Act of 1934 (as set forth in Note 3) were amended by eliminating the words "and retires," thus providing that a corporation realizes taxable gain upon the repurchase of its own bonds at a discount *whether or not the bonds are retired.*[13]

---

[7] Commissioner v. Jacobson, 69 S.Ct. 358, 369.

[8] Paxson v. Commissioner, 3 Cir., 1944, 144 F.2d 772, 776. See also Helvering v. Hallock, 1940, 309 U.S. 106, 114, 60 S.Ct. 444, 84 L.Ed. 604, 125 A.L.R. 1368; Commissioner v. Church, 335 U.S. 632, 69 S.Ct. 322, 337.

[9] Assuming that at that time nothing had been paid off on the original note issue. The record is bare on the subject of repayment of any of the outstanding notes either in 1941 or 1942, the tax years under review.

[10] Page 10, Taxpayer's Brief.

[11] 9 T.C. 268 at pages 273, 274.

[12] Page 13, Taxpayer's Brief.

[13] The enforcement by the Commissioner of the rule that the purchase by a corporation of its own bonds at less than the issue price or face value results in taxable income is not a part of the Internal Revenue Code per se. Rather, it is the result of a construction placed upon Section 22(a) by the Commissioner and the Treasury Department in the form of Regulations.

Up to the Revenue Act of 1932, the Regulations provided that "If, however, the corporation purchases and retires any of such bonds at a price less than the issuing price or face value, the excess of the issuing price or face value over the purchase price is gain or income for the taxable year." T.R. 77, Article 68(1) (c).

Although the Revenue Act of 1934 made no material change in Section 22 (a), the pertinent Regulations for that and ensuing years did eliminate the words "and retires". The first such Regulation was T.R. 86, Article 22(a)–18(1) (c), promulgated under the Revenue Act of 1934.

It is interesting to note that the words "and retires" were contained in the Regulations relating to the purchase by a corporation of its own bonds at a price

That the Amended Regulations correctly stated the law was specifically held in Tennessee Consolidated Coal Co. v. Commissioner of Internal Revenue, 2 Cir., 1944, 145 F.2d 631, 633-634, and were treated as a correct statement of the law by the Supreme Court in Commissioner v. Jacobson, supra.

Further, since Congress has re-enacted Section 22(a) of the Revenue Act of 1934 several times to date without substantial change, it is clear that the administrative construction, contained in the Amended Treasury Regulations deleting the element of retirement of the repurchased obligations, has received legislative confirmation. Brewster v. Gage, 1930, 280 U. S. 327, 336-337, 50 S.Ct. 115, 74 L.Ed. 457. Such Regulations have the force and effect of law within the limits prescribed by Congress. Massachusetts Mutual Life Insurance Co. v. United States, 1933, 288 U.S. 269, 53 S.Ct. 337, 77 L.Ed. 739; Hassett v. Welch, 1938, 303 U.S. 303, 58 S.Ct. 559, 82 L.Ed. 858. And, as stated by the Supreme Court in the Kirby case, supra, 284 U.S. at page 3, 52 S.Ct. at page 4, 76 L.Ed. 131, there is "no reason why the Regulations should not be accepted as a correct statement of the law."

It is worthy of note that even prior to 1934, when the Treasury Regulations still contained the phrase "and retires" the Courts in dealing with transactions where obligations were repurchased at a discount emphasized that mere physical cancellation of the repurchased obligations was not the sole test and that the "true nature of the transaction was a liquidation of the indebtedness." American Brake Shoe & Foundry Co. v. Interborough Rapid Transit Co., D.C.S.D.N.Y., 1936, 19 F.Supp. 234, 237.[14]

We so held in Montana, Wyoming & Southern R. Co. v. Commissioner of Internal Revenue, 3 Cir., 1935, 77 F.2d 1007. There the taxpayer in 1909 issued $900,000 of its own bonds at par. In the tax year of 1930 it bought back $55,000 par value of these bonds for $39,832.50. It did not surrender the repurchased bonds to the trustee for cancellation. Holding that the discount at which the bonds were repurchased constituted taxable income in 1930, we said:

"While it (the taxpayer) has not surrendered such bonds to the trustee for cancellation, *it still owns them, and by its purchase has proportionately paid such part of its indebtedness.*" (Emphasis supplied)

A similar view was taken in Garland Coal & Iron Co. v. Helvering, 1935, 64 App.D.C. 144, 75 F.2d 663.[15]

In conclusion it may be pointed out that manifestly the taxpayer would have been unable to pledge the repurchased bonds with the noteholders' trustee unless they had been *freed* of the obligation to the bondholders. As an inevitable corollary to that *freeing* there was also a *freeing* of the taxpayer's assets equivalent in amount to the par value of the repurchased mortgage bonds. The repurchase of the bonds and the *freeing* of equivalent assets was a si-

---

in excess of the issuing price or face value, and similarly, were removed at the same time as they were in connection with the purchase at a lower price. Cf. T.R. 77, Art. 69(1) (b) and T.R. 86, Art. 22(a)-18(1) (b). It is further interesting to note that while the purchase, under the Regulations, by a corporation of bonds at a price lower than issue price or face value results in taxable income, the purchase at a price in excess of issue price or face value results in a deductible expense for the taxable year.

[14] In the American Brake Shoe case the repurchased bonds were to be held in a sinking fund until all outstanding bonds had been redeemed, at which time they were all to be cancelled. The balance sheet of the taxpayer carried the repurchased bonds as an outstanding liability.

[15] In the Garland case, the taxpayer in 1928 purchased some of its outstanding bonds at a discount. The bonds were held in its treasury until 1929 when they were delivered to the trustee for cancellation. The Court held the taxable income was realized in 1928 when the bonds were repurchased although they were not retired until 1929 and the then existing Treasury Regulations contained the phrase "and retires". While the Court premised its ruling on the fact that the taxpayer in its 1928 balance sheet had subtracted the repurchased bonds from its previous bond liability and thus demonstrated that the object of the purchase was to retire the bonds, it is significant that it questioned whether the then Treasury Regulations were in violation of Section 22(a) of the Revenue Act.

multaneous process. The mere fact that subsequent thereto, *treating the repurchased bonds as its own assets,* the taxpayer pledged them as additional collateral under the note indenture, cannot and does not affect the self-executing asset-freeing transaction aforementioned. We agree with the Commissioner that under the Regulations and the authorities that for tax purposes the purchase of the bonds was the identifiable event affecting closed transactions and fixing the realization of income in the taxable years.

It is important to keep in mind that when the repurchased bonds were pledged with the noteholders' trustee they were the taxpayer's property and they continued to be so under the terms of the indenture which specified they should be held as "Pledged Securities" subject only to public sale in the event of default on the $7,400,000 note obligation. The true obligation on the bonds continued to run to the taxpayer and there was no obligation to pay any interest on the bonds to the trustee.

For the reasons stated the decision of the Tax Court will be reversed.