## HYPOTHEEK LAND CO. v. COMMISSION-ER OF INTERNAL REVENUE.

### No. 13158.

United States Court of Appeals
Ninth Circuit.

Dec. 15, 1952.

John Huneke, W. Kenneth Jones, Spokane, Wash., for petitioner.

Ellis N. Slack, Acting Asst. Atty. Gen., S. Dee Hanson and Jos. F. Goetten, Sp. Assts. to Atty. Gen., for respondent.

Before HEALY, BONE and POPE, Circuit Judges.

BONE, Circuit Judge.

The basic and material facts underlying the controlling issues presented in this review proceeding are clearly set forth in the opinion and findings of the Tax Court reported in 16 T.C. 1268. A detailed summary of these facts is therefore unnecessary.

In its opinion the Tax Court states that "the sole issue is whether the respondent [Commissioner] erred in reducing petitioner's deduction of interest allowable on its obligation to the [two so-called] Dutch banks from the rate of 5 per cent to 3 per cent." In disallowing the deduction for interest in excess of 3 per cent the Commissioner did not cite any section of the Code in his notice of deficiency.

In a brief in the Tax Court the Commissioner presented the case as coming within the purview of Section 45 of the Internal Revenue Code, 26 U.S.C.A. § 45, dealing with allocation of income and deductions. Apparently the Tax Court was not impressed or persuaded by this particular argument and it did not "consider" the merits of the argument made by the parties as to the applicability of Section 45—"because, in our opinion, the deduction * * is not an allowable deduction under section 23(b) of the Internal Revenue Code" 26 U.SC..A. § 23(b).[1] The view expressed

---

1. For many years prior to 1940, the two "Dutch Banks" here involved had been doing a mortgage loan business in the United States, and particularly in the State of Washington. These two corporations were owned by different stock-

was that "the deduction must be authorized under section 23(b) ultimately and at least pro forma regardless of the applicability of section 45. We do not think it is so authorized."

In summary, the court's opinion and holding was that the facts failed to show "any consideration" for the 1946 interest rates—that the predicament in which the two banks and their American attorney-in-fact found themselves after the German invasion of the Netherlands due to a possible attempted German expropriation of assets and properties of Netherlands Nationals, does not provide a *realistic basis* for appraising the circumstances and considerations *present in 1946* when the interest rate to the Netherlands corporations was increased by the contracts, the tax-wise validity of which is here challenged.

The Tax Court rejected a two-pronged argument advanced by petitioners. First, that because the Dutch banks had to pay an average of 5 per cent on their outstanding bonds in the Netherlands while getting only 3 per cent interest upon their holdings in this country represented by petitioner's assets, there was a *business necessity* for the increased interest rate; and second, that the *ratification* of the 1940 acts of the attorney-in-fact of the Dutch banks in an effort to meet the crisis precipitated by the German invasion, constituted a valid *consideration* for the 1946 interest contracts.

Its ultimate conclusion was that on the facts adduced in evidence covering the record of events in the war period, and the 1946 efforts of the two banks to arrive at some sort of an acceptable solution of the perplexing problems besetting their business in the Pacific Northwest and abroad, the challanged interest transaction stamped the increased rate as a *gratuitous payment* of interest during the tax period here in-

volved and as such not deductible under section 23(b).

On this review the Commissioner urges resort to section 45 of the Internal Revenue Code to support his position. He also relies on the broad premise that on the record petitioner "has failed to establish *any consideration* for the increase" on either legal or equitable grounds. He insists that the record indicates that the increased interest rate "was designed to effect larger deductions for interest which thus became a means for siphoning off and transmitting untaxed profits to the two Dutch banks." It is said that the ultimate findings and conclusions of the court covering the matters here adverted to are supported by substantial evidence.

It is also contended on this appeal that in .any event the taxpayer can not prevail because of the applicability of section 45, supra, authorizing the Commissioner to allocate gross income and deductions among related businesses if necessary to prevent evasion of taxes or clearly to reflect income.

Petitioner urges that while there are no basic facts in dispute by either party the Tax Court has announced certain conclusions from these facts which are clearly erroneous; and that its findings may be set aside if inconsistent with or not substantiated by the evidentiary facts admitted in evidence. Upon this predicate it urges that the court erred (a) in finding no business necessity for the 1946 contracts relating to the interest rate; (b) in finding that the 1946 contracts were gratuitous on the part of petitioner and made without consideration; (c) in failing to find that these contracts created a valid indebtedness and were *entirely reasonable* as between parties dealing at arm's length, and (d) in finding that deduction of interest in excess of 3 per cent was not a valid deduction under section 23 (b).

holders in the Netherlands but for reasons of economy, were operated by the same Board of Directors and officers. During this period the business of the two banks was conducted by an attorney-in-fact authorized to do business in the name of each of these corporations. Since 1939, Louis de Koning has been

the attorney-in-fact for each of the banks. Acting under that power of attorney Koning would make loans, accept mortgages, satisfy mortgages, sell and convey real property, and generally conduct the business of the two Dutch Banks.

In summary, petitioner argues that the Tax Court did not follow the facts in evidence which are inconsistent with its own findings; that the interest contracts had valid consideration and resulted *from business necessity*; that they were not entered into to evade or avoid taxes and were entirely reasonable and would have been entered into by strangers dealing at arm's length. All of this is urged as supporting the view that "any other conclusion results in an inconsistent position for income tax purposes."

■ An interesting situation arises where (as here) problems of law and fact are interwoven. In such a situation the Second Circuit recently approved re-examination of the force of the evidence by that Court. Towner v. Commissioner of Internal Revenue, 2 Cir., 182 F.2d 903, 905, certiorari denied, Farrell's Estate v. Commissioner of Internal Revenue, 340 U.S. 912, 71 S.Ct. 293, 95 L.Ed. 659. As to this phase of the problem of review, the Supreme Court has said that "The function of the court is to decide whether the correct rule of law was applied to the facts found; *and* whether there was substantial evidence before the Board to support the findings made." Also, that *"Unless* the finding of the Board [Tax Court] involves a mixed question of law and fact, the court may not properly substitute its own judgment for that of the Board." Helvering v. Rankin, 295 U.S. 123, 131,[2] 55 S.Ct. 732, 736, 79 L. Ed. 1343.

Since the Tax Court did not base its views on section 45 but in fact rested its conclusions on the force of section 23(b), petitioner was obliged to meet that issue. It contends (and we agree) that the Tax Court apparently concluded that there was no showing of a *business necessity* for the increase in the interest rate, a phase of the case linked to the problem of consideration for the execution of the interest contracts of 1946. Our attention is directed to certain findings thought by petitioner to have a vital bearing on this matter.[3] The evidence fully supports these particular findings and they are not challenged by the Commissioner.

■ In the face of these harsh conditions confronting the Dutch banks between 1940 and 1946 we find it impossible to reconcile such a situation with the Commissioner's argument that it does not spell out the existence of a "business necessity" for removal of this barrier to continued operations, or a "necessity" of any kind which the law should recognize as such. All transactions of petitioner between 1941 and 1946 were being seriously questioned by responsible outside parties, the troubles re-

2. See discussion of our review powers in Gillette's Estate v. Commissioner of Internal Revenue, 9 Cir., 182 F.2d 1010, 1013, 1014.

In McCullough v. Kammerer Corp., 9 Cir., 166 F.2d 759, this court disregarded findings of a trial court even though its findings were approved as to form by the losing side and no counter-findings upon the vital issue there concerned were offered. See comments by Judge Yankwich in 8 F.R.D. 271, 293, to 295.

3. "Commencing in 1941 the validity of the titles to mortgages and land which petitioner had acquired from Northwestern and DeTweede, was questioned by the Federal Land Bank of Spokane and by various other title examiners resulting in some cases in lawsuits, and in other cases the requirement that petitioner put up bond to guarantee its title. In 1941 a title insurance company refused to insure leases made by petitioner of mortgages previously owned by Northwestern and DeTweede unless the promissory note, which the mortgage secured, was produced for its inspection. Petitioner could not produce such notes because in most cases they were in Holland. The title insurance company would not insure the title of certain property transferred by petitioner without the insertion of a title note questioning the title to the property because of the invasion of the Netherlands."

"In 1945 and 1946 Northwestern was paying an average of 5.13 per cent interest upon its debentures issued in Holland and DeTweede an average of 4.79 per cent.

"In the spring of 1946, petitioner's officers told van Tyen that it was necessary to have the stockholders of Northwestern and DeTweede ratify and confirm the contracts of August 5, 1940, and the transfer of mortgages and lands thereunder in order to eliminate questions of the petitioner's clear title as to those properties."

sulting in law suits as the findings indicate. Obviously, petitioner could not hope to carry on normal business operations in the face of such seemingly insurmountable difficulties; its one way out was to definitely and finally dispose of such a menacing problem. One thing is certain—the banks and petitioner did not create the problem. It was thrust upon them by the exigencies of war over which they could have absolutely no control. An effective remedy had to be found if they were to remain in business.

It is also abundantly clear from the record that a real solution for the "title" problem could not be found while the Germans retained their grip on the Netherlands. Not until 1946 was it possible for petitioner to secure, or attempt to secure, from the stockholders of the two banks residing in the Netherlands, a "ratification" of the unorthodox and questionable steps taken in 1940 to safeguard, as far as possible, the assets of these banks against possible German expropriation. The 1940 fears of possible expropriation at the hands of a then victorious Germany seem to us to be fully justified. Certainly they could not be regarded as unrealistic. We share with petitioner the view that ordinary prudence and sound business judgment called for prompt and drastic action to thwart what was then a real threat to the Dutch banks. Even so, the steps taken produced new and vexatious problems that remained unsettled until 1946.

The record emphasizes the fact that the stockholders residing in the Netherlands were not, and could not be consulted when Koning organized petitioner to take over their American assets. They did not discover until 1945 that this property had been "sold" under such unusual circumstances. The sale price and all of the other attributes of this transaction had been fixed without their knowledge or consent.

Nothing in the record dictates or justifies the conclusion that under any theory of law they were *obligated* to ratify what had been done after they learned of the steps taken. They had been stripped of any and all control over their American banks and we may not speculate on what they might have done

about the whole matter had they been free to act during the war period. The necessities of the war compelled them to await its uncertain consequences; if the German grip on the Netherlands was broken they could then be free to find out what had happened to their American bank properties. The actions of the Government of the Netherlands in exile indicates the strenuous efforts of that Government to protect the property of its nationals located in other countries.

What the Netherlands officers of the Dutch banks learned in 1946 did not change the hard fact that they were validly obligated to pay an average rate of 5 per cent interest on their outstanding bonds in Holland. The problem thus confronting them was not fictitious but very real. Whatever revenues they might have received from their American bank properties during the war years could not be received even if transmittal of funds was possible, this because of German control and seizure of such funds.

We do not doubt that these stockholders would have been well within their legal rights had they seen fit to repudiate the entire transaction of 1940 and challenge its legality in American courts in an action to nullify all that had been done in the absence of stockholder approval. In light of the difficulties over the question of title then facing petitioner even the threat of such a proceeding in 1946 would have presented new and serious complications which reasonably careful business men would surely strive to eliminate if at all possible.

We agree with petitioner that the 1940 contracts were not only "highly questionable," they were open to serious challenge on sound legal grounds. The simple fact is that the 1940 transactions failed to satisfy reasonable demands of interested outsiders in the matter of titles, and this was a problem of vital concern to petitioner.

It is clear from the record that the agreements of 1946 which ratified what had been done in 1940 with a change in the interest rates as consideration, wiped out business difficulties which had plagued petitioner for several years. We also agree with petitioner that there is a great differ-

ence in the legal, binding effect where a principal, learning of a prior act of his agent, changes and ratifies that act for business reasons and makes it binding on both parties, as was done here, *and* a situation in which corporations arbitrarily change interest rates between them from year to year on existing contracts without consideration or reason, as the Commissioner contends happened here and could continue to happen. In short, we think that there was, in the unusual and seemingly unprecedented circumstances of this case, a legitimate business purpose and/or necessity for the change in the interest rate.[4]

Being of this view we must and do conclude that the "ratification" did remove the title difficulties that had beset petitioner for four years, and that the contracts approving the questionable sales of 1940, did confer material benefits on the petitioner. We therefore hold that conclusions of the Tax Court to the contrary are clearly erroneous. In this posture of the facts we conclude that the 1946 ratification contracts executed by the Netherlands stockholders were a valuable consideration for the increased interest rate. Furthermore, we think that these contracts were validly based on the situation confronting the parties in 1946 and were rested on mutual promises entered into at that time.

It can not be doubted that further continuance of the uncertain and very challenging business conditions existing when the 1946 transaction was effected would have worked to the great detriment of the Dutch banks. It was a situation that presented to them the choice whether to accept the transactions or take the position that they were void. The difficulties over titles were not of their creation. They faced a fact and not a theory; something had to be done, and we are of the view that under the circumstances here shown the interest rate contracts are reasonably and properly to be regarded as "arm's length" transactions. As such, we regard the steps taken to be rational and reasonable and a legitimate solution of a vexing business problem which might easily have forced petitioner out of business.

There is an absence of showing in this record that the interested parties were guilty of fraud or bad faith. As petitioner points out, even if the Dutch banks had been selling to an entirely independent United States corporation, the rational conclusion is that they would certainly have made an interest rate sufficient to meet their own obligations. If the authors of the emergent transfers of 1940 had not been so moved by the fear of German expropriation and then set an interest rate calculated to discourage such an action, and had then made the rate 5 per cent, there would have been no occasion or necessity for a change in 1946 due to the financial position of the Dutch banks. Petitioner argues persuasively that the Commissioner would have raised no question about a 5 per cent rate had it been set in 1940.

The record indicates that at the 1940 conference leading to the corporate organization of petitioner there was no discussion concerning taxes. What could then be done to thwart a possible attempt of Germany to expropriate assets of the banks in the United States appears to have been the overshadowing concern of all present. Witness E. W. van Tyen, a party to the negotiation for drawing up the contract of August 5, 1940, testified concerning some of the reasons for adopting such a contract. He stated that the interest rate was set at 3 per cent non-cumulative to make it just as difficult as possible for any possible Nazi appropriator of that contract; that after this transaction the Nazis could still appropriate the contracts themselves, that is, the accounts receivable as represented by that contract which were the only things they could appropriate. The purpose of all parties was to make it just as difficult as possible for the Nazis to get any benefit from such an appropriation hence the making of the interest rate as low as feasible and still have a contract that seemed reasonable in a neutral country. He pointed out that the terms of the contract were

---

4. It should be noted that the increase of the interest rate was not made retroactive to cover the war years; it was to take effect as of July 1, 1945 to cover tax liability for petitioner's fiscal year ending June 30, 1946.

such that it left to the buyer an option as to when it should be paid, if prior to 1970, which "made it just as tough as possible on the selling party."

From the record we can not spell out a justifiable conclusion that tax evasion or enrichment of the Netherlands stockholders was a purpose, or one of the purposes, of the parties in the later agreements of 1946. In the course of the instant litigation Jan van Tyen, one of the co-directors of the two Dutch banks up to January 1, 1950, and then residing in the Netherlands, testified by deposition as follows:

"Q. 112. In your negotiations, if any, with Hypotheek Land Company prior to May 23, 1946, what if any, consideration was given to the possible tax effects which might result by reason of the terms of the amendment as finally concluded in the agreement dated May 23, 1946, explain fully. A. 112. It was principally done for business reasons as stated before. We had to pay five per cent to our debenture holders so that we could not be satisfied with the three per cent rate on that contract. I never considered taxes as part of the discussions. I realized that taxes would have to be paid after any change and I would not object to it, but I wanted a contract change as outlined."

"Q. 25. If your answer to No. 21 above is in the affirmative, please state whether the tax problems confronting the Northwestern and Pacific Hypotheek and DeTweede Northwestern and Pacific Hypotheek either in the United States or in the Netherlands, or both, was the motive which led to the negotiations and carrying out of such transactions. A. 25. No."

W. J. Guepin, another co-director of these Dutch banks since 1928 (a resident of the Netherlands) also testified by deposition, as follows:

"Q. 24. If your answer to No. 20 above is in the affirmative, please state whether the tax problems confronting the Northwestern and Pacific Hypotheek Bank and DeTweede Northwest-

ern and Pacific Hypotheek Bank either in the United States or in the Netherlands, or both, was the motive which led to the negotiations and carrying out of such transactions. A. 24. No, it was not."

In the light of this testimony and of facts shown by the record we are unable to agree with the Commissioner that the 1946 increase was a "gratuitous" payment of interest and hence not a valid deduction of interest. Nor can we agree with the Tax Court that the facts in the instance case make it comparable to the situation shown to exist in Central Cuban Sugar Co. v. Commissioner, 16 T.C. 882, 890, where execution of the contract under consideration was found to be motivated solely by a tax-saving scheme. See same case on appeal, 2 Cir., 198 F.2d 214.

In its opinion the Tax Court makes a brief reference to the problem of past consideration as an element in this case. We can not agree that a mere reference to or inclusion in the contracts of past acts constitutes the consideration as "past consideration." Consult Lucas v. Ox Fibre Brush Company, 281 U.S. 115, 50 S.Ct. 273, 74 L.Ed. 733. It would do violence to facts clearly established in the evidence to hold that there was absolutely *no consideration* for entering into the 1946 contracts.

In its opinion the Tax Court states that the obvious result, if not the chief purpose in 1946 was to provide petitioner with an increased deduction from gross income which thus became a means of transmission of untaxed profits to the Dutch banks. This suggests that the tax judge may have felt that there *might* have been an indisclosed attempt on the part of the parties to evade taxes.

A fair appraisal of the facts shown by the record does not support such an inference. The testimony of Jan van Tyen indicating his realization that taxes would have to be paid on revenues passing to the Dutch Banks; that net income of the Dutch banks from United States sources is taxable the same as that of other taxpayers. Counsel points out that increase in the deduction for interest for petitioner would bring about a reciprocal increase in gross income

from sources within this country, a fact which would increase the taxable income of the Dutch banks. Cf. Greer-Robins Co. v. Commissioner, 9 Cir., 119 F.2d 92 and Commissioner of Internal Revenue v. Union Motors, 9 Cir., 119 F.2d 93.

In connection with section 45 of the Internal Revenue Code, it should be pointed out that whatever his view of the close association between petitioner and the Dutch banks, this clearly disclosed fact did not lead the Commissioner to make any attempt to "allocate, distribute or apportion" income between the corporations. He merely *disallowed* the deduction. Section 45 nowhere permits disallowance of a *deduction,* the action herein taken by him. General Industries Corp. v. Commissioner, 35 B.T.A. 615, 617. At no time during these proceedings, from the issuance of the original deficiency notice through the close of the testimony in the Tax Court, did the Commissioner make any statement or showing that the gross income of the two Dutch banks was *determined* by him for taxing purposes by using the 3 per cent instead of 5 per cent interest. So we have no evidence of allocation, distribution or apportionment of income; no showing that any figure was used in computing the gross income of the Dutch banks except the 5 per cent. We think that section 45 is not applicable to the "disallowance" here involved.

Petitioner emphasizes that between 1940 and 1945 the Commissioner recognized petitioner as a taxpayer and the 1940 agreements as valid agreements calling for a 3 per cent interest deduction. Apparently he still recognizes the 3 per cent deduction as a valid deduction in spite of the serious question as to the validity of the 1940 agreements. The Dutch banks entered the picture for the first time in 1946 when their stockholders could speak. They became parties to the contracts of 1940 only on condition that the interest rate be changed, and compliance with this condition was also the basis for the ratification. Contrary to the views of the Commissioner, we think that the unusual events of this case are so linked together as to make them inseparable parts of one transaction.

Since we are in agreement with the basic contentions of the petitioner, the decision of the Tax Court must be and is hereby reversed.