Harold WENER, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Molly WENER, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 15025.

United States Court of Appeals
Ninth Circuit.

March 25, 1957.

939

Franklin K. Lane, III, Robinson &
Powers, Los Angeles, Cal., for appellant.

Charles K. Rice, Acting Atty. Gen.,
Robert N. Anderson, Helen A. Buckley
and Lee A. Jackson, Attys., Washington,

D. C., and John Potts Barnes, Chief Counsel, Washington, D. C., for appellee.

Before CHAMBERS and BARNES, Circuit Judges, and YANKWICH, District Judge.

YANKWICH, District Judge.

The facts in the controversy are, in the main, not in dispute.

## I.

### The Facts in the Controversy

On September 7, 1943, the petitioners (to be referred to as "the taxpayers"), husband and wife, entered into a limited partnership agreement with two other couples, Leon A. and Dorothy Jane Smoller and Alan A. and Margaret M. Joseph (to be referred to as "the remaining partners"), which was to be known as the "Boreva Sportswear Co." The partnership engaged in the manufacture of women's sportswear, and was conducted at Chicago, Ill., where it had a sales office and Stoughton, Wis., where it had a manufacturing plant. The husbands became general partners and the wives limited partners.

On September 6, 1946, an agreement was entered into dissolving the partnership as to the taxpayers by allowing their withdrawal from it as of January 31, 1947, the remaining partners being given the option of acquiring the interests of the taxpayers. The agreement contained a formula for determining the full value of the interests of the taxpayers,—the determination to be made by a designated certified public accountant. It also obligated Harold Wener and his wife not to engage in the business of manufacturing women's sportswear for five years from and after the severance date within a radius of fifty miles from any manufacturing plant of the partnership.

On February 1, 1947, the taxpayers executed a Bill of Sale transferring their interests in the assets of the partnership. The purchase price stated in the Agreement of Dissolution was approximately $75,131.12, as computed by the accountant. Partial payments of $10,428.20 to the husband and $5,265.14 to the wife

were made at the time of the purchase. These and certain withdrawals left a balance of $38,713.80 due to the husband and $19,564.27 to the wife, to be paid in three installments, computed on a percentage basis, due, respectively, on January 31, 1948, when forty per cent was to be paid, on April 15, 1948, when thirty per cent was to be paid and April 15, 1950, when the final installment of thirty per cent was to be paid. All deferred installments bore interest at the rate of four per cent per annum. The taxpayers reported the sale of their partnership interest as a "long-term capital loss" for 1947, fifty per cent of which amount, $391.25 in the case of the husband, and $197.53 for the wife, was taken into account. The claimed loss was based on the contention that the sale price of each partnership interest was less than the cost of the interest equivalent to capital account January 31, 1947.

After receiving the first installments of the purchase price the taxpayers moved to California, and established at Westminister a women's sportswear manufacturing plant. The first year's operation resulted in a loss, $20,000 being borrowed from the Bank of America, using as collateral the indebtedness due from the remaining partners. The need for additional cash became pressing. After failing to secure it, Wener began corresponding with his former partners in an endeavor to receive from them a *prepayment* of the entire balance. After offers and counteroffers were exchanged, the remaining partners finally offered to pay $35,000 in cash for the unmatured balance due under the Dissolution Agreement and sale. An agreement entitled "Mutual Release" was entered into on August 25, 1947, in which the remaining partners agreed to pay to the taxpayers the sum of $35,000 in cash in lieu of the three installments totaling $59,260.-13. The money was paid and was used by the taxpayers in their business, $10,-000 going to the Bank of America as a balance payment on the loan. Of the $35,000 received, Wener's share was $23,-257.50, his wife's share was $11,742.50.

In their income tax returns for 1947, the taxpayers claimed the difference between the balance due on the sale and the amount settled for as ordinary losses, the loss claimed by the husband being $15,456.46, and that of the wife being $7,803.77. These claimed losses were disallowed by the Commissioner on December 21, 1951, and income tax deficiencies were assessed against the taxpayers. They then petitioned the Tax Court for a redetermination of the deficiency as determined by the Commissioner in his Notice dated December 21, 1951. The Tax Court sustained the Commissioner, its Findings and Opinion being filed on June 29, 1955.[1] The parties having filed an agreed computation of the tax, the Tax Court filed its decision in each case on September 2, 1955, finding a deficiency against the husband for the year 1947 in the sum of $5,279.53, and against the wife in the sum of $238.-59.

Before us are petitions to review these decisions.

## II.

### Was There an Ordinary Loss?

At the bottom of this controversy is the question whether the taxpayers suffered an ordinary loss in the course of business under Section 23(e) (1) and (2) of the Internal Revenue Code of 1939, —as they contend, or whether their loss, if any, was a "long-term capital loss" as defined in Section 117(a) (5) of the same Code, as the Commissioner and Tax Court found.[2]

The last named Section defines "long-term capital loss" in this manner:

"(5) Long-term capital loss.

"The term 'long-term capital loss' means loss from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such loss is taken into account in computing net income." [3]

The taxpayers concede that the debt owed them on January 31, 1947, when they retired from the partnership and sold their interests to the remaining partners, *was a capital asset.* They insist, however that the subsequent transaction of August 25, 1947, whereby, in consideration for advancing the time of its payment, they accepted a sum less than was owed to them by the remaining partners was a distinct and separate transaction which resulted in a loss during the taxable year which was totally deductible as a loss incurred by individuals "in trade or business" [4] or "in any transaction entered into for profit, though not connected with the trade or business." [5]

■ While the tendency of courts is to interpret the word "business" in taxing statutes in a broad sense,[6] nevertheless, in passing on claimed business losses, Courts are very strict in relating them to the *actual business* in which the taxpayer is engaged.[7] In the case before us, this problem is subordinated to the main problem which is (a) whether there was "a sale or exchange" of property and (b) when it took place.

■ This Court has held repeatedly that upon the dissolution of a partnership and transfers of interest in it to co-owning partners or others, the inter-

1. Both are now published: Wener v. Commissioner, 1955, 24 T.C. 529.

2. 26 U.S.C., 1952 Ed., § 23(e) (1) and (2) or § 117(a) (5).

3. 26 U.S.C., 1952 Ed., § 117(a) (5).

4. 26 U.S.C., 1952 Ed., § 23(e) (1).

5. 26 U.S.C., 1952 Ed., § 23(e) (2).

6. Maloney v. Spencer, 9 Cir., 1949, 172 F.2d 658; Commissioner of Internal Revenue v. Stokes' Estate, 3 Cir., 1952, 200 F.2d 637, 638-639; Gilford v. Commissioner, 2 Cir., 1952, 201 F.2d 735, 736; Giblin v. Commissioner, 5 Cir., 1955, 227 F.2d 692, 696-697.

7. Bedell v. Commissioner, 2 Cir., 1929, 30 F.2d 622; United States v. Adamson, 9 Cir., 1947, 161 F.2d 942 and cases cited in Note 2, at page 944, of that opinion. And see, Putnam v. Commissioner, 1956, 352 U.S. 82, 87-88, 77 S.Ct. 175, 1 L.Ed.2d 144; Nicholson v. Commissioner, 10 Cir., 1954, 218 F.2d 240; Hickerson v. Commissioner, 2 Cir., 1956, 229 F.2d 631.

ests received by the continuing partners or transferees give rise to a gain or loss upon the sale of a capital asset within the meaning of Section 117(a) (1–3) of the Internal Revenue Code of 1939, and similar ones under prior Acts.[8]

██ And generally, courts have refused to expand the meaning of the words "sale" and "exchange" and have ruled that these words refer only to such transactions as would be considered sales and exchanges in the business world.[9] In speaking of liquidation of debts, the Supreme Court has stated that

"Payment and discharge * * * is neither sale nor exchange within the commonly accepted meaning of the words." [10]

██ While the language just quoted was used in conjunction with the redemption of a bond, it is applicable to the payment of *any debt*. So we find that it is generally held that where, through a valid transaction, the amount of an indebtedness is reduced, the reduction may be income to the debtor in the year in which the adjustment is made. This is true whether we are dealing with an individual debt or the debt of a corporation represented by bonds, debentures or other obligations.[11] By the same reasoning, when a creditor, in consideration of immediate cash payment, agrees to accept less than the amount of the debt owed to him, but payable in the future, the loss, if any, is not on a "sale" or "exchange." The principle has been well summed up by the Tax Court in another case:

"But it is now too well settled to require extended discussion that the compromise of an indebtedness, whether it be based on inability to collect or by reason of anticipating the payment of the indebtedness, is not a sale or exchange within the meaning of the statute, and, therefore, is not a transaction that falls under Section 117." [12]

In the case from which this excerpt is quoted, the Tax Court adopted the reasoning of a case relied on by taxpayers here.[13] In that case, the maker had declined to pay the balance of $22,418.84

8. 26 U.S.C., 1952 Ed., § 117(a) and (b). See, Stilgenbaur v. United States, 9 Cir., 1940, 115 F.2d 284; United States v. Adamson, supra Note 7; Hatch's Estate v. Commissioner, 9 Cir., 1952, 198 F.2d 26, 28–29; Ward v. Commissioner, 9 Cir., 1955, 224 F.2d 547.

9. United States v. Fairbanks, 9 Cir., 1938, 95 F.2d 794, 796; Fairbanks v. United States, 1939, 306 U.S. 436, 59 S.Ct. 607, 83 L.Ed. 855; Bingham v. Commissioner, 2 Cir., 1939, 105 F.2d 971, 972; Felin v. Kyle, 3 Cir., 1939, 102 F.2d 349; Helvering v. William Flaccus Oak Leather Co., 1941, 313 U.S. 247, 249, 61 S.Ct. 878, 85 L.Ed. 1310; Stoddard v. United States, D.C.Mass., 1943, 49 F.Supp. 641, 644.

10. Fairbanks v. United States, supra Note 9, 306 U.S. 437, 59 S.Ct. 608. And see, Commissioner of Internal Revenue v. Jacobson, 1949, 336 U.S. 28, 49–50, 69 S.Ct. 358, 93 L.Ed. 477.

11. Mertens Law of Federal Income Taxation, 1955, Zimet & Stanley Rev., Vol. 2, §§ 11.19, 11.21(b); United States v. Kirby Lumber Co., 1931, 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131; Commission-er of Internal Revenue v. Coastwise Transp. Corp., 1 Cir., 1934, 71 F.2d 104; L. D. Coddon & Bros., Inc., v. Commissioner, 1939, 37 B.T.A. 393; Helvering v. Jane Holding Corp., 8 Cir., 1940, 109 F.2d 933, 940; Helvering v. A. L. Killian Co., 8 Cir., 1942, 128 F.2d 433; Central Paper Co. v. Commissioner, 6 Cir., 1946, 158 F.2d 131; Pacific Magnesium, Inc. v. Westover, D.C.Cal., 1949, 83 F.Supp. 644, 648–649; Commissioner of Internal Revenue v. Pittsburgh & W. V. Ry. Co., 3 Cir., 1949, 172 F.2d 1010; Pacific Magnesium, Inc. v. Westover, 9 Cir., 1950, 183 F.2d 584; Spear Box Co. v. Commissioner, 2 Cir., 1950, 182 F.2d 844, and cases cited in Note 12 of that opinion.

12. West Coast Securities Co. v. Commissioner, 1950, 14 T.C. 947, 961. See, Mertens Law of Federal Income Taxation, 1955, Zimet & Ness Rev., Vol. 5, § 30.14; Walker v. Commissioner, 5 Cir., 1937, 88 F.2d 170; United States v. Burrows Bros. Co., 6 Cir., 1943, 133 F.2d 772; Ogilvie v. Commissioner, 6 Cir., 1954, 216 F.2d 748; Sanders v. Commissioner, 10 Cir., 1955, 225 F.2d 629, 635.

13. Hale v. Helvering, 1936, 66 App.D.C. 242, 85 F.2d 819.

due on promissory notes which were part of the purchase price of real property. After suit was instituted by the creditors, they settled by accepting a smaller amount, although the debtor was solvent and the promissory notes were secured by a first mortgage on real property. The Court held that the transaction was not a sale, saying:

"Accepting the definitions relied upon by the petitioner as constituting the ordinary meaning of the words in question, such definitions do not include the disposition of the notes under the facts here. There was no acquisition of property by the debtor, no transfer of property to him. Neither business men nor lawyers call the compromise of a note a sale to the maker. In point of law and in legal parlance property in the notes as capital assets was extinguished, not sold. In business parlance the transaction was a settlement and the notes were turned over to the maker, not sold to him. In John H. Watson, Jr. v. Commissioner of Internal Revenue, 27 B.T.A. 463, overruling Henry P. Werner v. Commissioner of Internal Revenue 15 B.T.A. 482, it was held that the payment at maturity, of the face amount of bonds purchased at a premium, was not a sale or exchange resulting in a capital loss. If the full satisfaction of an obligation does not constitute a sale or exchange, neither does partial satisfaction." [14]

There are several distinctions between the factual situation in the case referred to and the case before us. That case involved the sale of real property which was consummated in 1925 when R. W. Hale and W. T. Hale, Jr., sold an orange grove in Florida for the sum of $60,000. Full title was transferred to the purchaser upon payment of $20,000 in cash and $40,000 in notes secured by a first mortgage. Each of the sellers reported his prorated share of the profits upon this transaction in 1925 and paid the tax thereon. When the notes given for the balance of the purchase price matured in 1927, the maker, as already stated, although financially able to pay, refused to do so. In 1929, an action was instituted in the federal district court for the Northern District of Ohio to collect the unpaid amount due on the notes, —$22,418.84. Prior to the judgment and during the taxable year of 1929, a settlement was agreed upon which resulted in a loss to each of the two sellers in the sum of $7,497.22. It is evident that in that case the original transaction had been *fully* completed, as to all parties. Title to the property had been transferred and *new obligations were created, promissory notes,* secured by mortgage. When the sellers settled the lawsuit, they accepted a reduction in the amount *past due* on the notes.

In the case before us, the only obligation to pay was the *original one contained in the agreement of dissolution of partnership,* which was in full force August 25, 1947. The debtor in the case discussed, although solvent, *refused* to pay the notes when they matured. In the case before us, the partnership was also solvent, so far as appears, and the remaining installments of the purchase price *were not* due until 1948 and 1950. The remaining parties *did not* question the debt.

The Court in the cited case treated the settlement of the lawsuit as a *distinct* transaction arising on a *new obligation* which was created when the property was sold and title passed and concluded that the compromise with the maker was not a "sale or exchange" of capital assets.

In the case before us, we are not dealing with the compromise of a disputed claim, but with an agreement between debtor and creditor to accept part payment of a debt before maturity and discharge the residue. Such agreements are given effect by the courts in tax and other matters, because their validity has been recognized in Anglo-American law almost for centuries. [15]

14. Hale v. Helvering, supra Note 13, 85 F.2d at page 821.

15. 17 C.J.S., Contracts, § 114; 12 Am. Jur., Contracts, § 89; Williston on Con-

■ The reason was stated by the Supreme Court many years ago and is valid today:

"An agreement to give a less sum for a greater, *if the time of payment be anticipated,* is binding; *The reason being, as expressed in Pennel's case, (5 Co., 117) that peradventure parcel of the sum, before the day, would be more beneficial than the whole sum on the day."* [16] (Emphasis added.)

And if the courts find, in tax litigation, that a taxpayer, in good faith, has accepted less than is due him as a consideration for anticipating the due date of an obligation, they treat the transaction as an ordinary loss.

### III.

#### The Problem on Review

The problem which arises in this case does not stem so much from any disagreement as to the principles which we have just expounded, as from their application to the facts before us. Indeed, the Tax Court in its decision did not repudiate the chief case on which the taxpayers rely.[17] Their opinion states that the question considered and decided in that case was not reached because

"prior to the dates the remainder of the purchase price was to become due, there was a renegotiation, adjustment, or revamping of the sale

itself both as to price and the terms of payment." [18]

And there are many differences in the facts and their legal implications between the two situations, as already noted.

■ *A. The Scope of Review.*

Under the law, the scope of our review, in cases of this character, is the same as on appeal.

"from decisions of district courts in civil actions tried without a jury." [19]

The Findings of the Tax Court will not be disturbed unless clear error appears.[20] But concededly when the facts are not in dispute and wrong legal conclusions are attached to them, we are not bound to respect them but may draw different and correct ones of our own.[21]

■ In the case before us, the Findings are based chiefly upon stipulated facts and documentary evidence. The only witness who testified before the Tax Court was one of the taxpayers, Harold Wener. His testimony related to the circumstances under which the threatened failure of his business venture in California compelled him to conduct the negotiations which resulted in the agreement to accept $35,000 in cash for the three installments not yet due. His testimony was not contradicted. He has not been otherwise impeached and his testimony not being inherently improbable, cannot be disregarded, although he is

tracts, Rev.Ed., 1936, Vol. 1, § 121; Restatement, Contracts, § 76; Illustration 6; Corbin on Contracts, 1950, Vol. 1, § 192, pp. 628–629.

16. Very v. Levy, 1851, 13 How. 345, 54 U.S. 345, 360, 14 L.Ed. 173.

17. Hale v. Helvering, supra Note 13.

18. Wener v. Commissioner, supra Note 1, 24 T.C. at page 532.

19. 26 U.S.C., 1952 Ed., § 1141(a); I.R.C., 1954, § 7482(a).

20. National Brass Works, Inc. v. Commissioner, 9 Cir., 1953, 205 F.2d 104, 107; Stockton Harbor Industrial Co. v. Com-

missioner, 9 Cir., 1954, 216 F.2d 638, 640; Ward v. Commissioner, 9 Cir., 1955, 224 F.2d 547, 550, and cases cited in Note 1 of that opinion; Pacific Homes v. United States, 9 Cir., 1956, 230 F.2d 755, 759. And the taxpayer has the burden of proving that the Tax Court's ruling was "clearly erroneous" in rejecting the claim of total loss: See, Cohn v. Commissioner, 9 Cir., 1955, 226 F.2d 22, 24; Homann v. Commissioner, 9 Cir., 1956, 230 F.2d 671.

21. Hypotheek Land Co. v. Commissioner, 9 Cir., 1952, 200 F.2d 390, 392; Gensinger v. Commissioner, 9 Cir., 1953, 208 F.2d 576, 583; McGah v. Commissioner, 9 Cir., 1954, 210 F.2d 769, 771.

an interested party.[22] The Tax Court in its Findings referred to his financial involvement in California by reason of his new venture as "a factor" which prompted him to begin the negotiations which resulted in the acceptance of a smaller sum for the unmatured portion of the sale price of his interest in the partnership. At the oral argument, this was admitted to be *the sole* motivation. So the good faith of the transaction is not questioned. Which brings us back to the main proposition: Did the Tax Court commit clear error in finding that there were not *two transactions but one* and that the so-called "Mutual Release" of August, 1947, was *not* a separate and distinct agreement of compromise but a modification of the terms of the prior agreement by *reduction* of the sale price in consideration of the prepayment of the remainder before it became due?

B. *The Relation of Separate Transactions.*

The relation of separate transactions to one another *presents a question of fact* for the trier of facts. Thus, in one of the cases in our own Circuit, where a partnership had been dissolved by a decree of court, the relation of a release agreement entered into by one of the partners to the original transaction seven years after the dissolution was considered a question of fact for the trial court to determine.[23] There, the transaction, which was in the nature of a general release was retrojected into the past in order to give to the taxpayer the benefit of the sale of a capital asset rather than consider the money subsequently received for a release of his former partners a separate transaction resulting in "ordinary income."

Similarly in a noted case which is referred to in the opinion of the Tax Court

in the present case, and has been made the subject of comment by both sides,[24] a judgment was rendered in 1944 against a corporation and one of the taxpayers individually by reason of the liquidation of a corporation, in which each of the two taxpayers owned 50 per cent of the stock. The taxpayers in 1937 decided to liquidate and divide the proceeds of the corporation. Partial distributions were made in 1937, 1938, and 1939, which were followed by a final one in 1940. The taxpayers reported the proceeds obtained from the transaction classifying them as capital gains.

In 1944, a judgment was rendered against the old corporation and against one of the taxpayers individually. The two taxpayers were required to pay the judgment for the corporation, of the assets of which they were the transferees. They classified the loss as an ordinary business loss, each taking a tax deduction of 100 per cent of the amount paid. The Commissioner viewed the 1944 payment as part of the original liquidation. The Tax Court disagreed and treated it as an ordinary business loss. In turn the Court of Appeals treated the loss as a capital loss. The Supreme Court finally sustained the Commissioner and treated the loss as a *capital loss*. The importance of this opinion lies in the fact that, in order to arrive at this conclusion, the Supreme Court sustained the view that the judgment paid *four years* after complete liquidation and *seven years* after liquidation began in 1937, could be related back to the time of liquidation for tax purposes. The Court said:

"Taxpayers were required to pay the judgment because of liability imposed on them as transferees of liquidation distribution assets. And it is plain that their liability as transferees was not based on any

22. Chesapeake & Ohio Ry. v. Martin, 1931, 283 U.S. 209, 215–216, 51 S.Ct. 453, 75 L.Ed. 983; Pence v. United States, 1942, 316 U.S. 332, 339–340, 62 S.Ct. 1080, 86 L.Ed. 1510; San Francisco Ass'n for the Blind v. Industrial Aid for Blind, 8 Cir., 1946, 152 F.2d 532; Nicholas v. Davis,

1953, 10 Cir., 204 F.2d 200, 202. In re Collins, D.C.Cal., 141 F.Supp. 25, 28–29.

23. United States v. Adamson, supra Note 7, 161 F.2d at page 944.

24. Arrowsmith v. Commissioner, 1952, 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6.

ordinary business transaction of theirs apart from the liquidation proceedings." [25]

The logic of these cases in their application to the facts before us is quite obvious. The partnership was dissolved as to the taxpayers as of January 31, 1947. The remaining partners purchased the interest of the taxpayers and a Bill of Sale was given on February 1, 1947. The remaining partners took over the interests of the taxpayers. The agreement by which the retirement of the taxpayers from the partnership was achieved was fully *executed* and *absolute* as to them, but remained *partly executory* as to the remaining partners.[26] For there was something yet to be done by them, i. e., pay the balance of the sale price installments due in 1948 and 1950.

The remaining indebtedness was not represented by any formal *new obligation,* such as a lien on the partnership assets or even a promissory note. Indeed, there was no evidence of it except in the promise to pay contained in the agreement of dissolution of the partnership. The Bill of Sale referred to the dissolution agreement, but mentioned no specific money consideration. Grant that the release executed August 25, 1947, added nothing to the absoluteness of the sale and that the compromise of a debt is *not* a "sale" or "exchange", the fact remains, however, that this is not the *unrelated* compromise of a debt incurred "in trade or business" or in a "transaction entered into for profit." To the contrary, *it is a part of the original transfer.* It not only grew out of it, but its very existence related back to the agreement of dissolution of partnership and the Bill of Sale which transferred the capital assets designated as "the property presently conveyed". We cannot isolate this reduction in the price of the sale of the taxpayers' partnership interests, voluntarily agreed to while the agreement *was still executory* as to a portion of the price, in consideration of its anticipated payment and call it the separate compromise of a debt. Nor can it be considered as "incurred in trade or business" because the taxpayers *were not,* on August 25, 1947, engaged in the business of the old partnership. Nor did it arise from their new venture. It cannot be considered a transaction entered "into for profit" because the taxpayers were not in the business of dealing in or selling what, at most, was an account receivable.[27] And a different conclusion is not commanded by cases cited by the taxpayers relating to withdrawal of lawyers from partnerships.[28] Those cases are decided on the principle, *which has the approval of this court,* that in such partnerships there is no or only nominal capital, that the partnership's real assets consist of the personal efforts of the partners and a retiring partner surrenders not a portion of capital assets, but merely the right to receive *a portion of the earnings in matters handled while he was a partner.* His distributive share, in these circumstances, is not considered a capital asset *but income,* as it would have been if he had remained in the partnership.[29]

In the case before us, when the taxpayers retired from the partnership,

25. Arrowsmith v. Commissioner, supra Note 24, 344 U.S. 8, 73 S.Ct. 73.

26. 12 Am.Jur., Contracts, § 9; Williston on Contracts, Rev.Ed.1936, § 22; 77 C.J.S., Sales, §§ 247–248; 78 C.J.S., Sales, § 556; Farrington v. Tennessee, 1877, 95 U.S. 679, 683, 24 L.Ed. 558.

27. Bedell v. Commissioer, supra Note 7.

28. Hutcheson v. Commissioner, 1951, 17 T.C. 14; Gannon v. Commissioner, 1951, 16 T.C. 1134.

29. Hill v. Commissioner, 1 Cir., 1930, 38 F.2d 165; Escher v. Commmissioner, 3 Cir., 1935, 78 F.2d 815; Helvering v. Smith, 2 Cir., 1937, 90 F.2d 590; Doyle v. Commissioner, 4 Cir., 1939, 102 F.2d 86. The case in which this court has approved the doctrine of these cases and applied it to the withdrawal of a partner from a building contractors' partnership is: Trousdale v. Commissioner, 9 Cir., 1955, 219 F.2d 563, 566–567. There it appeared that the capital of the partnership was nominal and that it derived its income from the personal efforts of the partners. So, when one of the partners assigned his interest, the Court sustained the view of the Tax Court that the transaction was

" * * * not in substance and effect the sale of a partnership interest, but

they surrendered *absolutely* and *unconditionally* their shares of the capital assets of the manufacturing concern. For them they received a *new capital asset,*—namely, certain amounts of cash and other sums to be paid in the future. The compromise agreement by which they accepted a reduction of the balance of the installments *not yet due* in consideration of anticipation of its payment

> "was not a mere cancellation of indebtedness, but was a reduction in the purchase price of property." [30]

And the Tax Court was right in so finding. Its decision in each case is affirmed.

that the payments made to the petitioner were merely payments made to a retiring partner which represented his distributive share of earnings for past services." at page 567.

And see, Hirsch v. Commissioner, 7 Cir., 1940, 115 F.2d 656.

30. Helvering v. A. L. Killian Co., 8 Cir., 1942, 128 F.2d 433, 434. In following this case, more recently the Court of Appeals for the 6th Circuit has summed up the attitude of courts in envisaging a transaction as a whole:

"Courts have not hesitated in appropriate circumstances to look behind the cancellation of indebtedness in a given calendar year, and in doing so *to evaluate in its entirety the transaction out of which the cancellation arose.* Thus, it has been consistently held that the partial forgiveness of indebtedness in a given year does not constitute taxable income to the debtor *if the actual effect of the entire transaction was simply to reduce the purchase price of property acquired in a prior year."* Bradford v. Commissioner, 6 Cir., 1956, 233 F.2d 935, 939. (Emphasis added.)

The language quoted is especially appropriate to the situation before us. Indeed, the fact that the reduction in price in the case cited occurred in a subsequent year, while here it took place in the *same taxable year,* warrants more readily the conclusion that it must be related to the agreement from which it stemmed, entered into earlier in the year 1947.