Harold W. Bird and Brynia Bird v. Commissioner.
Bird v. Commissioner
Docket No. 92473.
United States Tax Court
T.C. Memo 1963-16; 1963 Tax Ct. Memo LEXIS 328; 22 T.C.M. (CCH) 65; T.C.M. (RIA) 63016; January 18, 1963
Joe E. Burris, Esq., City National Bank Bldg., Kansas City, Mo., and A. Henry Cuneo, C.P.A., for the petitioners. Hugh C. McMahon, Esq., for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined a deficiency in income tax for the taxable year ended December 31, 1958, in the amount of $4,039.66. The sole issue is whether the amount of $8,625.32, which represents payment of corporate liabilities arising from petitioner Harold Bird's sale of capital stock in the Gilhara Corporation, was a part of the long-term capital loss incurred in connection with the sale; or whether it was deductible by petitioners as a nonbusiness expense under section 212 or, alternatively, as an ordinary loss incurred *330 in a transaction entered into for profit under section 165(c)(2) of the Internal Revenue Code of 1954. Findings of Fact Some of the facts were stipulated and are so found. The stipulation of facts is incorporated herein by reference. Petitioners, Harold W. and Brynia Bird, are husband and wife, who resided during the calendar year 1958 at 5000 Oak Street, Kansas City, Missouri. They filed their joint Federal income tax return for the calendar year 1958 with the district director of internal revenue at Kansas City, Missouri. Harold W. Bird (hereinafter referred to as the petitioner) is a building material dealer associated with Sonken-Galamba Corporation as a distributor of masonry products. In 1958 petitioner owned 50 percent of the capital stock of the Gilhara Corporation, which was incorporated under the laws of the State of Mississippi in 1953 and which operated a motel at Greenville, Mississippi. The remaining 50 percent of the capital stock of the Gilhara Corporation was owned in 1958 by Gilbert A. Schlesinger, a nephew of the petitioner. Both the petitioner and Schlesinger were officers and directors of the corporation, but the operations of *331 the motel were under the supervision of a salaried manager. Neither the petitioner nor Schlesinger ever received any salary, interest or dividends from the corporation. The petitioner and Schlesinger had each paid $7,000 for their capital stock in the Gilhara Corporation. Periodically from the inception of the corporation they had made unsecured advances to it. On November 1, 1958, these advances to the corporation aggregated $122,824.02, one-half of which had been made by the petitioner. In addition, the petitioner and Schlesinger were personally liable on a first mortgage note of the corporation which amounted to approximately $40,000. In 1958, and for sometime prior thereto, the Gilhara Corporation was operating at a loss and was feeling the pressure of increased competition because of the construction of two new, large and modern motels in the Greenville area. On November 29, 1958, the petitioner and Schlesinger signed a document called a "Sale Contract" with Charles Bivona and Charles Manon under the terms of which they agreed to sell their stock interest in the Gilhara Corporation for the total sum of $170,000, payable as follows: (1) $30,000 in cash; (2) $40,000 by release *332 of personal liability on the first mortgage note on the physical assets of the Gilhara Corporation; and (3) by a second mortgage note of $100,000. Upon the signing of the contract the buyers deposited $5,000 earnest money with the sales broker, Wilts. By the terms of the contract possession of the Gilhara Motel premises was to be given to the purchasers on or before January 1, 1959. On December 30, 1958, the petitioner and Schlesinger met with Bivona and Manon at Greenville, Mississippi, for the purpose of consummating the transaction entered into on November 29, 1958. At this meeting the purchasers stated that they were not willing to complete the transaction and take over the corporation unless the current corporate liabilities to non-shareholders amounting to $17,250.65 were paid. The corporation had insufficient funds at that time to pay the liabilities. After consultation, and in order to complete the transaction and prevent any further losses, the petitioner and Schlesinger acceded to the demands of the purchasers and agreed to pay personally these corporate liabilities. On that day, December 30, 1958, the purchasers delivered to the petitioner and Schlesinger a cashier's *333 check in the amount of $25,000 which represented the balance of the cash payment due them under the contract of November 29, 1958. On the same day, the petitioner and Schlesinger deposited the check for $25,000, which had been made payable to them individually, in the bank account of the Gilhara Corporation in order to expedite the transaction and because they had no bank account in their own names in Greenville. The corporation then issued its checks against this deposit in payment of the current corporate liabilities. At the same time a check for $3,500 was drawn against the deposit as a final payment on the sales commission. The total sales commission due and paid to Wilts by the petitioner and Schlesinger was $8,500. On the next day, December 31, 1958, a final agreement was executed by the petitioner and Schlesinger, as parties of the first part, and Charles Bivona and Charles Manon, as parties of the second part. The agreement provided, in part, as follows: 1. That Parties of the First Part simultaneous with the execution of this agreement, will endorse and deliver to Parties of the Second Part all of the outstanding authorized shares of Capital Stock in the Gilhara Corporation *334 of Greenville, Mississippi, said shares having a par value of $100.00 each and totaling 210 shares in number and being Stock Certificates 1, 2 and 3 of said Gilhara Corporation. 2. That Parties of the First Part will execute and deliver a Bill of Sale simultaneously with the execution of this agreement, conveying and transferring over all their right, title and interest, if any, in and to the inventory of items contained in Gilhara Motor Hotel in Greenville, Mississippi, and more particularly set worth in Exhibit "A" attached hereto and made a part hereof as if the same was copied herein, together with all bed linen, towels, washrags, and such items now used and being used in the operation of the said Gilhara Motor Hotel in Greenville, Mississippi. 3. That the said Parties of the First Part have made the following contributions to the Gilhara Corporation in conformity with certain tentative agreements having been made between the parties hereto: (a) Have paid all Accounts Payable owing and due by the Gilhara Corporation up to December 31, 1958, said Accounts Payable being for services, supplies and other incidentals incurred by the said Gilhara Corporation in and about the operation *335 of the business of Gilhara Motor Hotel, said Parties of the First Part paying all such accounts as are outstanding and upon the books of the said Gilhara Corporation through December 31, 1958. (b) Have paid off the outstanding Chattel Mortgage executed by Gilhara Corporation upon those certain television sets purchased from Mills-Morris Company of Memphis, Tennessee, and said Parties of the First Part have provided said Parties of the Second Part with evidence of said payment of said mortgage. (c) Have paid all ad valorem taxes and assessments against the real property owned by the said Gilhara Corporation in Washington County, Mississippi for the year 1958. (d) Have paid all Sales Taxes to the State of Mississippi and all Withholding Taxes and Social Security Taxes on wages of employees of Gilhara Corporation up and through the quarterly period ending December 31, 1958. (e) Parties of the First Part shall pay and be charged with the prorata share of the Franchise Taxes, if any, owing and due the State of Mississippi for the period June 1, 1958 through December 31, 1958 as well as all Federal Income Taxes and State of Mississippi Income Taxes, if any, owing and due from the *336 net taxable earnings of the said Gilhara Corporation for the period June 1, 1958 through December 31, 1958. (f) Have paid all payments owing and due the American National Insurance Company of Galveston, Texas, by the said Gilhara Corporation upon the installment mortgage indebtedness of the said Gilhara Corporation up and through the December 1958 payment, said mortgage indebtedness being Loan No. 9668 with the said American National Insurance Company. The petitioner in their signed and sworn protest filed with the respondent in July, 1960, stated: A meeting of the parties was arranged for the end of December, 1958, to work out the details and close the deal. At this meeting the buyers stated that they would be willing to conclude the deal under either of the following two plans. Under the first plan, they would pay $170,000.00 for the motel property assuming the first mortgage note of approximately $40,000.00 and paying the balance of $130,000.00 as follows: $30,000.00 as a down-payment and $100,000.00 in deferred payments to be secured by a second mortgage on the property. Under the second plan, they would purchase the corporate stock for $30,000.00 provided all the corporate *337 liabilities excepting only the first-mortgage note would be paid off prior to the sale and provided further that the stockholders would scale down their advances to the corporation from $122,824.02 to $100,00.00. ($100,000.00). On their Federal income tax return for the year 1958 the petitioners claimed as "other deductions" the amount of $8,625.32. This deduction was explained with the following statement: Prior to the sale, the stockholders had to pay off personally the liabilities of the Gilhara Corporation in the amount of $17,250.65. Taxpayer's share of this expense is $8,625.32. Petitioners also reported a long-term capital loss from the "sale of stock interest in and loans receivable from Gilhara Corporation, in which taxpayer owned 50 percent of the stock. On Schedule D of the return they claimed a deduction of $1,000 for the capital loss. In the notice of deficiency for the taxable year 1958 respondent determined that the amount of $8,625.32 claimed under "other deductions" was not deductible in full but represented a capital loss subject to the limitations imposed by section 1211(b) of the Internal Revenue Code of 1954. Opinion We have *338 only one issue presented here. What tax treatment should be accorded the amount paid in satisfaction of the corporate liabilities? Petitioners argue that the amount in controversy was an ordinary and necessary expense paid by them for the production and collection of income and for the conservation and maintenance of property held for the production of income, and thus deductible in full under section 212 of the Internal Revenue Code of 1954. [1] In the alternative, the petitioners argue that it was an identifiable loss sustained during the taxable year 1958, which was not compensated for by insurance or otherwise, and hence an ordinary loss deductible in full under section 165(c). [2]
*339 Respondent contends, however, that the $8,625.32 constitutes a capital loss limited by the provisions of section 1211(b)[3] on the ground that the payment was, in actuality, either a reduction in the sales price or, alternatively, a contribution to capital. We agree with the respondent. His position is legally sound and far more persuasive *340 than that advocated by the petitioners. Viewing the facts and circumstances pertaining to the petitioner's sale of his interest in the Gilhara Corporation, we have reached the conclusion that this must be regarded for tax purposes as one whole, indivisible transaction. To treat it as two separate and distinct transactions is entirely unrealistic and would create a windfall never intended by Congress. Cf. Putnam v. Commissioner, 352 U.S. 82 (1956). It is clear to us that the agreement to pay the current corporate liabilities was simply one component part of the complete transaction involving the sale of the petitioner's stock on which a capital loss was reported. Consequently, such payment must be considered as an adjustment in the sales price. All actions taken in the instant case were designed to accomplish but one purpose - the sale of the petitioner's capital stock and unsecured advances in the Gilhara Corporation. The "Sale Contract" of November 29, 1958, the renegotiations of December 30, and the final agreement of December 31 very clearly demonstrate this. Irrespective of the subject matter and terms ascribed to the original contract, the negotiations conducted *341 on December 30 either modified or superseded it, finally resulting in a completed transaction as set forth in the final agreement of December 31. Hence, we are not impressed by the argument made by the petitioners that they sustained a loss separate and apart from the sale of their capital interest in the Gilhara Corporation. We reject it as being without foundation in fact or in law. See Harold Wener, 24 T.C. 529 (1955), affirmed 242 F. 2d 938 (C.A. 9, 1957). In support of his position the respondent relies on Arrowsmith v. Commissioner, 344 U.S. 6 (1952); Duveen Brothers, Inc., 17 T.C. 124 (1951), affirmed 197 F. 2d 118 (C.A. 2, 1952), certiorari denied 344 U.S. 884 (1952): and Estate of James M. Shannonhouse, 21 T.C. 422 (1953). The general principle of law enunciated in Arrowsmith, and followed by this Court in Shannonhouse, is that the character of losses relating to the sale or exchange of a capital asset must be determined by the nature of the transaction which disposed of the capital *342 asset. If it is a capital transaction, then any losses directly related thereto must be of the same character, i.e., capital losses. In the Arrowsmith case the Supreme Court held that where stockholders, who had liquidated their corporation over several years and reported profit therefrom as capital gain, subsequently, as transferees of the corporation's assets, were required to pay a judgment rendered against the corporation, their loss was reportable as a capital loss in the year in which it was incurred and not an ordinary loss. On somewhat different facts involving a guarantee agreement, the same result was reached in our Duveen Brothers decision. In Shannonhouse the taxpayers realized capital gains in 1947 on the sale by warranty deed of income-producing realty. In 1949 they paid certain amounts to the purchasers in discharge of liabilities for breach of covenants of title to the property. We held that the expenditures resulted from the sale of property on which a capital gain had been reported in 1947 and that the Arrowsmith rationale required the expenditures to be given the same capital treatment. Each of these cases dealt with a subsequent adjustment of an earlier sale *343 of a capital asset where the taxpayers were legally obligated to pay. Yet the courts did not permit them to deduct the amounts they paid as ordinary losses. In this case, however, there was no legal compulsion or obligation on the petitioner to step in and offer to pay the current corporate liabilities. There was not even a subsequent adjustment of an earlier sale, but instead an adjustment in the same transaction. Thus, the facts here are much stronger for denying an ordinary loss than they were in the cases cited by the respondent. This was recognized by Justice Black in the Arrowsmith opinion when he commented: * * * And it is plain that their liability as transferees was not based on any ordinary business transaction of theirs apart from the liquidation proceedings. It is not even denied that had this judgment been paid after liquidation, but during the year 1940, the losses would have been properly treated as capital ones. For payment during 1940 would simply have reduced the amount of capital gains taxpayers received during that year. In view of our opinion on this point, we find it unnecessary to discuss the respondent's alternative contention that the payment was a capital *344 contribution. Turning now to the petitioners' contentions, we believe they are not entitled to deduct the $8,625.32 as a nonbusiness expense, pursuant to section 212, for several reasons: (1) The stipulated facts show that the corporate liabilities were not Actually paid by the petitioner and Schlesinger, but were paid instead by checks which the Gilhara Corporation issued after the $25,000 cashier's check was deposited in the corporate bank account. (2) Even if the petitioner did pay the amount in question and it was "necessary" to prevent additional loss on his investment in the corporation, such payment would not be "ordinary" in the common, accepted use of that term in the statute. As Justice Cardozo said in Welch v. Helvering, 290 U.S. 111 (1933): Men do at times pay the debts of others without legal obligation * * * but they do not do so ordinarily, * * *. Indeed, if language is to be read in its natural and common meaning * * *, we should have to say that payment in such circumstances, instead of being ordinary, is in a high degree extraordinary. (3) The case *345 law clearly sets forth the requirement that a nonbusiness expense under section 212 (and its predecessor, section 23(a)(2), I.R.C. 1939) may be deducted by a taxpayer only if it is truly his own expense and not that of another taxpayer. See Deputy v. duPont, 308 U.S. 488 (1940); Harry Kahn, 26 T.C. 273 (1956); Bert B. Rand, 35 T.C. 956 (1961); and Robinson v. Commissioner, 53 F. 2d 810 (C.A. 8, 1931). (4) Generally, when capital assets are sold, expenditures incidental to the sale are not treated as ordinary and necessary expenses. They are considered in the nature of an offset against the amount realized from the sale because they are specifically attributable to the sales transaction. Spreckles v. Commissioner, 315 U.S. 626 (1942). The petitioners rely heavily on Alleghany Corporation, 28 T.C. 298 (1959), which we think is distinguishable. In that case the expenditures were made to protect Alleghany's business *346 "as a closed-end investment company." The situation here is quite different. This amount was not paid to protect the petitioner's business as a building material dealer. We likewise find no merit to their alternative position. This was not a deductible loss under section 165(c). As we have just pointed out, it was not incurred in connection with the petitioner's trade or business. Therefore, if deductible, it must be as a loss incurred in a separate transaction entered into for profit, though not connected with a trade or business. An amount voluntarily paid in settlement of an obligation of a third party cannot be said to be a loss of the taxpayer within the meaning of section 165(c)(2). See White v. Commissioner, 61 F. 2d 726 (C.A. 9, 1932), affirming 21 B.T.A. 1087; A. Giurlani & Bro. v. Commissioner, 119 F. 2d 852 (C.A. 9, 1941), affirming 41 B.T.A. 403; Robinson v. Commissioner, supra; and Candler v. Commissioner, 76 F. 2d 548 (C.A. 5, 1935), affirming a Memorandum Opinion of this Court. In the sense *347 that no enforceable legal obligation existed against the petitioner to pay the current corporate liabilities, the expenditure must be regarded as voluntary. There is no loss when an investment such as this is protected by a stockholder's additional payment. Moreover, since the petitioners concede in their brief that they could not recoup the payment involved herein, the expectation of profit is missing. The best the petitioner could hope for was that he would not sustain a greater loss if the consummation of the transaction should fail. How can a transaction which will result in a loss to the taxpayer, and from which he cannot possibly reap a profit, be a transaction entered into for profit? Obviously, the answer is that it cannot be. Cf. Goldsborough v. Burnet, 46 F. 2d 432 (C.A. 4, 1931); Burdan v. Commissioner, 106 F. 2d 207 (C.A. 3, 1939), affirming 37 B.T.A. 642. The cases cited by the petitioners are not only distinguishable on their facts from this case, but also because the payment deducted in each one of them was not part of a transaction involving the sale of capital assets. In C. H. White, 15 B.T.A. 1375 (1929), *348 two stockholders advanced money to their corporation at a time when it was insolvent, and where the advances were made for protecting the business prestige of the stockholders by enabling them to close out the corporate business in such a way that they could engage again in the same business. In Seufert Bros. Co. v. Lucas, 44 F.2d 528 (C.A. 9, 1930), the expenditure was made to save part of the taxpayer's orchards and prevent damage to its irrigation system. And in Louisiana Jockey Club, 13 B.T.A. 752 (1928), the payment was made in order to obtain immunity from interference by city authorities with the conduct of the taxpayer's business - the operation of a race track. These cases do not support the contention of the petitioners. Accordingly, we hold that the loss sustained from the sale by the petitioners of their capital interest in the Gilhara Corporation was a capital loss limited by the provisions of section 1211(b), and that the respondent's determination with respect thereto is correct. Decision will be entered for the respondent. Footnotes
1. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year - (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income, or * * *↩
2. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business, and * * *↩
3. SEC. 1211. LIMITATION ON CAPITAL LOSSES. * * *
(b) Other Taxpayers. - In the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus the taxable income of the taxpayer or $1,000, whichever is smaller. For purpose of this subsection, taxable income shall be computed without regard to gains or losses from sales or exchanges of capital assets and without regard to the deductions provided in section 151 (relating to personal exemptions) or any deduction in lieu thereof. If the taxpayer elects to pay the optional tax imposed by section 3↩, "taxable income" as used in this subsection shall be read as "adjusted gross income."