Andrew S. Harrill and Sadie J. Harrill v. Commissioner.
Harrill v. Commissioner
Docket No. 4857-62.
United States Tax Court
T.C. Memo 1964-221; 1964 Tax Ct. Memo LEXIS 117; 23 T.C.M. (CCH) 1340; T.C.M. (RIA) 64221; August 20, 1964
*117 Petitioners entered into an agreement dated June 6, 1958, with Blackwelder Textile Co., Inc., a corporation, and Joseph J. Immerman, a stockholder in Blackwelder, whereby certain obligations owed to or by said parties were settled or cancelled. Held: (1) The fair market value of certain property received by petitioners was determined; (2) The aggregate amount received by petitioners was allocable proportionately between the capital and ordinary income items included in the obligations owed to petitioners by Blackwelder; (3) Petitioners did not sustain a nonbusiness bad debt loss upon the cancellation of the balance due upon a note given petitioners by Immerman for the purchase price of Blackwelder stock; (4) Petitioners are entitled to depreciation on such property only for the period June 6, 1958, to and including December 31, 1958; and (5) Petitioners are not liable for additions to tax under section 6653(a), I.R.C. 1954. Robert B. Lloyd, Jr., for the petitioners. Harvey S. Jackson, for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined a deficiency in the income tax of petitioners for the year 1958 in the amount of $19,017.03, and an addition to tax under section 6653(a) of the Internal Revenue Code of 1954 in the amount of $950.85. The deficiencies in question resulted from a written agreement dated June 6, 1958, whereby petitioners received $15,000 in notes, later paid in full, and certain machinery and equipment, and certain obligations owing to and by petitioners were cancelled or declared satisfied. The basic question presented is to what extent the amount realized by petitioners is taxable as ordinary income, and to what extent it constituted return of *119 capital. To determine this question it is first necessary to determine the amount realized by petitioners, and this in turn depends upon the fair market value of the machinery and equipment at the time of the transfer. Another question is the amount allowable to petitioners for depreciation of such property in the taxable year 1958. A final issue is whether petitioners are liable for additions to tax for negligence under section 6653(a) of the Internal Revenue Code of 1954. On brief, respondent "concedes that the adjustment to petitioners' taxable income for capital gains in the amount of $17,968.75, as set forth in the statutory notice, was erroneous." Instead of a capital gain, respondent states "petitioners sustained a nonbusiness bad debt by virtue of a promissory note in the unpaid principal balance of $50,000.00 [due and owing by Joseph J. Immerman] having become worthless in the year 1958," for which a deduction of $1,000 should be allowed in computing petitioner's adjusted taxable income for 1958. Findings of Fact The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Andrew S. Harrill (hereinafter *120 sometimes referred to as petitioner) and Sadie J. Harrill are husband and wife residing in Rutherfordton, North Carolina. For the taxable year 1958, they timely filed a joint Federal income tax return, computed on the cash basis, with the district director of internal revenue at Greensboro, North Carolina. Blackwelder Textile Company, Inc. (hereinafter referred to as Blackwelder) was incorporated under the laws of North Carolina in 1945 and maintained its principal office in Cherryville, North Carolina. Prior to June 6, 1958, it was engaged in the manufacture of nylon stretch yarns and ladies' hosiery in separate divisions located in Cherryville and Rutherfordton, respectively. In 1947, petitioner and Joseph J. Immerman purchased equal interests in the outstanding capital stock of Blackwelder, consisting of 440 shares of common stock having a par value of $100 per share. Thereafter the stock was reissued, and held as follows: Joseph J. Immerman
220 shares
Andrew S. Harrill
219 shares
Sadie J. Harrill
1 share Petitioners' basis in the stock was $22,500. On April 14, 1954, petitioners and Immerman entered into the following written contract whereby petitioners *121 agreed to sell the 220 shares of Blackwelder stock which they owned to Immerman: THIS CONTRACT, Made and entered into this 14th day of April, 1954, by and between A. S. HARRILL and SADIE JENKINS HARRILL, of Rutherfordton, North Carolina, parties of the first part, and J. J. IMMERMAN, of New York City, New York, party of the second part, WITNESSETH: That, for and in consideration of the sum of $1.00 paid by the party of the second part to the parties of the first part, and in consideration of the terms and conditions of this indenture, the parties hereto do hereby contract and agree as follows: 1. The parties of the first part will sell, transfer and convey unto the party of the second part 220 shares of stock of Blackwelder Textile Co., Inc. for a total consideration of $80,000.00, payable according to the following schedule $10,000.00 cash upon execution of this agreement and delivery of said shares of stock to Charles Rosenstein, escrow agent, as hereinafter provided; $5,000.00 on October 1, 1954, and $5,000.00 at the end of each six months thereafter until the contract price shall have been paid in full. The party of the second part shall execute a note in the amount *122 of $70,000.00 to secure all deferred payments (to-wit, all payments exclusive of the original $10,000.00 paid at the time of execution of this agreement), said note to provide for the payment of installments of $5,000.00 each six months after April 1, 1954, until the contract price has been paid in full, together with interest at the rate of 2% per annum, which shall be payable semiannually on the dates fixed for the payment of principal installments. 2. The party of the second part agrees to purchase all stock of the parties of the first part, to-wit, 220 shares of Blackwelder Textile Co., Inc., for a consideration of $80,000.00 and to pay said contract price according to schedule set out in paragraph 1 above. 3. Upon execution of this indenture, the parties of the first part shall deliver to Charles Rosenstein, of Rutherfordton, N.C., the 220 shares of stock of Blackwelder Textile Co., Inc, endorsed in favor of the party of the second part or in blank. The said Charles Rosenstein shall hold said stock as escrow agent for the parties to this indenture until all payments of the purchase price have been paid by the party of the second part to the parties of the first part. Upon *123 satisfactory evidence to said escrow agent that the contract price has been paid in full, said stock or other indicia of ownership of said stock shall be delivered to the party of the second part. Provided, however, that if the said escrow agent shall receive written notice from the parties of the first part that the party of the second part has defaulted for 30 days or more in the payment of any sum due under the terms of the note securing the purchase price of said stock and if 30 days shall have passed from and after the receipt of such notice of default, then upon demand made by the parties of the first part, the escrow agent shall deliver said stock or other indicia of ownership thereof to the parties of the first part. Upon such delivery by the escrow agent of the stock to the parties of the first part, all rights in said stock of the party of the second part shall be terminated. In the event the parties of the first part are not able to deliver the stock certificates to the escrow agent as above provided, the parties of the first part shall deliver such proper indicia of ownership therein as shall be reasonably necessary to release and transfer all rights in said stock of *124 the parties of the first part to the party of the second part, subject to the escrow agreement above set out. As long as said stock is held in escrow, all those rights of shareholders as to said stock shall be vested in the party of the second part. Provided, however, that it shall be contemplated that each of the parties of the first part shall retain the rights of a shareholder of one share of stock each and each of the parties of the first part shall therefore be qualified and entitled to attend shareholders or directors meetings or to serve as officers or as directors of the corporation. 4.-A- The party of the second part agrees that he will cause the corporation to continue the employment of A. S. Harrill as General Manager of the corporation at least for the term of one year, and as General Manager, A. S. Harrill shall be entitled to the usual privileges and rights enjoyed by the general manager of said corporation and he shall receive the additional compensation as follows: $100.00 per week salary; $50.00 weekly expense account; A bonus computed as of each calendar year of employment of 1 1/2% of all gross sales of the corporation in excess of $200,000.00. These bonus *125 payments shall be computed on the basis of a calendar year but partial payments thereof may be made in convenient installments throughout the course of the year upon the approval of the directors of the corporation. In the event the said A. S. Harrill shall remain as General Manager after the year 1954, he shall continue to receive compensation above provided, but after the expiration of one calendar year, the tenure of office as general manager and the compensation for said service shall be within the discretion of the Board of Directors of the Corporation. If the said A. S. Harrill shall discontinue, for any reason, his position as General Manager, he agrees that he will not enter into any business competing with the business conducted by the Blackwelder Textile Co., Inc., in the State of North Carolina for a period of one year from and after severance of employment with Blackwelder Textile Co., Inc., without the consent and approval of the party of the second part. 4.-B- A. S. Harrill hereby agrees that he will not, during the term of his employment, enter into any other business or assume other business obligations without the consent of Blackwelder Textile Co., Inc. 5. *126 The party of the second part will cause the corporation to transfer to the parties of the first part all life insurance policies owned by the corporation on the lives of either of the parties of the first part. 6. The party of the second part will cause the corporation to convey a one-half undivided interest in the store in Rutherfordton, presently owned by the corporation, to A. S. Harrill. It is contemplated that the party of the second part will purchase the other one-half undivided interest in said business and that the party of the second part and A. S. Harrill will operate said business as a partnership. 7. The effective date of this contract shall be April 1, 1954. 8. This contract shall be binding on the parties hereto, their heirs and assigns. IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals, as of the day and year first above written. [Signatures omitted.] Petitioners received payments on the purchase price of said stock from Immerman as follows: Year
Amount
1954
$15,000
1955
10,000
1956
5,000
Immerman made no further installment payments to petitions on the purchase price of the Blackwelder stock prior *127 to June 6, 1958. As of June 6, 1958, Immerman owed petitioners the principal sum of $50,000 for the Blackwelder stock. Prior to June 6, 1958, petitioners had not made any demand for delivery of the stock by the escrow agent to them. Blackwelder at no time guaranteed the payment of or endorsed the promissory note securing the payment of the purchase price for the Blackwelder stock. Petitioner remained in the employ of Blackwelder after the agreement of April 14, 1954, and until June 6, 1958. In 1951 petitioner loaned Blackwelder $30,000 to pay on new knitting machines. This loan was not evidenced by a note or secured by a mortgage, and no part thereof was paid prior to June 6, 1958. As of June 6, 1958, Blackwelder was indebted to petitioner for loans and services rendered as follows: Nature of Obligation
Amount
Loan payable - A. S. Harrill
$30,000.00
Accrued Salaries
5,725.99
Accrued Commissions
11,416.37
Insurance premiums advanced
6,190.33
Finishing work
3,862.41
Total
$57,195.10
As of June 6, 1958, petitioner owed Blackwelder $2,200.25 for unpaid rent on machinery due by H. and H. Hosiery Mills, a sole proprietorship owned and operated by petitioner. *128 On June 6, 1958, the following written agreement formalizing the settlement of business and personal obligations was executed by the parties signatory thereto: AGREEMENT THIS AGREEMENT, made and entered into this the 6th day of June, 1958, by and between BLACKWELDER TEXTILE COMPANY, INC., a corporation organized and existing under the laws of the State of North Carolina, with its principal place of business at Cherryville, North Carolina; IMMERMAN BROTHERS, INC., a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in Patterson, New Jersey; and JOSEPH J. IMMERMAN of Gaston County, North Carolina, parties of the first part, and H. AND H. HOSIERY MILL of Rutherford County, North Carolina, a partnership composed of Andrew S. Harrill and Gordon Holler; HARRILL YARN COMPANY, a corporation organized and existing under the laws of the State of North Carolina, with its principal place of business in Rutherfordton, North Carolina; HARRILL INSURANCE AGENCY of Rutherford County, North Carolina, a partnership composed of Andrew S. Harrill and Arthur Harrill; LAUREL HILL TEXTILE SHOP of Rutherford County, North Carolina, a partnership *129 composed of Andrew S. Harrill and Joseph J. Immerman; and ANDREW S. HARRILL, individually, and his wife, SADIE J. HARRILL, both of Rutherford County, North Carolina, parties of the second part; WITNESSETH: That for and in consideration of the sum of $10.00 paid by the parties of the second part to Blackwelder Textile Company, Inc., and in consideration of the covenants and agreements of the parties of the second part herein contained, and in furtherance of a mutually satisfactory understanding between all of the parties hereto, the said Blackwelder Textile Company, Inc., hereby covenants and agrees as follows: - 1 - To convey by a properly executed Bill of Sale, with full covenants of warranty, to Andrew S. Harrill all furnishings, fixtures, machinery and equipment used or intended for use in connection with the operation of the Harrill Hosiery Mill and which is located in that part of the Doncaster Building on South Washington Street, Rutherfordton, North Carolina, which is occupied by Harrill Hosiery Mill, a subsidiary of Blackwelder Textile Company, Inc.," - 2 - To issue a series of fifteen (15) non-interest bearing promissory notes payable to Andrew S. Harrill in *130 the amount of One Thousand ($1,000.00) Dollars each, making a total obligation of Fifteen Thousand ($15,000.00) Dollars, with the first note to be due and payable on or before the 1st day of September, 1958, and each succeeding note of the series to be due and payable on or before the 1st day of each succeeding calendar month thereafter, until all of said notes have been paid in full, and to secure said notes by the execution and delivery of a chattel mortgage to Andrew S. Harrill on five (5) Universal Model 10-B Twisters which are located in the Blackwelder Textile Company, Inc. building in Cherryville, North Carolina; - 3 - That any and all rental money which may be due and owing to the said Blackwelder Textile Company, Inc., by H. and H. Hosiery Mill of Rutherfordton, North Carolina, is hereby declared to be cancelled and no longer owing. That for and in consideration of the sum of $10.00 paid by the parties of the first part to parties of the second part, and in consideration of the covenants and agreements of the parties of the first part herein contained, and in furtherance of a mutually satisfactory understanding between all of the parties hereto, said parties of the second *131 part hereby covenant and agree as follows: -1- Harrill Yarn Company agrees to, and does hereby cancel the debt of $3,862.41 owed to it by Blackwelder Textile Company, Inc., and the relation of creditor and debtor shall from this date cease. Harrill Yarn Company further agrees that any other debts, obligations or monies owed to it by any and all of the parties of the first part are also cancelled and declared to be no longer owing; -2- Andrew S. Harrill, individually, agrees to, and does hereby cancel the debt of $30,000.00 plus all accrued and unpaid interest to date owed to him by Blackwelder Textile Company, Inc., by virtue of a direct loan of money, and the relation of creditor and debtor shall from this date cease as to this amount. Andrew S. Harrill further agrees that any and all accrued salaries and/or commissions due him by Blackwelder Textile Company, Inc., which remain unpaid as of the 19th day of May, 1958, are hereby declared to be satisfied and no longer owing; -3- Andrew S. Harrill, individually and as a partner of Laurel Hill Textile Shop, agrees that any monies owed to Laurel Hill Textile Shop and/or Andrew S. Harrill, as of the 19th day of May, 1958, by *132 any of the parties of the first part (which amount is approximately $5,000.00) is cancelled and declared to be no longer owing; -4- Andrew S. Harrill, individually, and his wife, Sadie J. Harrill agree that the balance due of approximately $50,000.00, plus any accrued and unpaid interest to date, which is due and owing to them by Joseph J. Immerman for and on account of 220 shares of common stock in Blackwelder Textile Company, Inc., which the said Joseph J. Immerman purchased from them on April 14, 1954, is hereby declared to be cancelled and no longer owing; -5- Andrew S. Harrill and Arthur Harrill, individually and as partners of Harrill Insurance Agency agree that unpaid insurance premiums in the amount of $6,190.33 owed to them as of the 19th day of May, 1958, by Blackwelder Textile Company, Inc., are hereby declared to be satisfied and no longer owing; it is further agreed and understood that any insurance premiums due on policies which were in effect prior to May 19, 1958, and which were inadvertently omitted from the above stated amount of $6,190.33 are also cancelled and no longer owing. This agreement is made with the express understanding that any premium refunds *133 which Blackwelder Textile Company, Inc. would otherwise be entitled to on account of the cancellation of any policy or policies which were in effect prior to May 19, 1958, shall not be paid to Blackwelder Textile Company, Inc., but shall be retained by Harrill Insurance Agency; -6- All parties of the second part agree to, and do hereby cancel all debts which Immerman Brothers, Inc., may owe to any of the parties of the second part, and the relation of creditor and debtor shall from this date cease. It is expressly understood and agreed, however, that Immerman Brothers, Inc., shall not be obligated or responsible to any of the parties of the second part for any monies whatsoever by virtue of this instrument, but is made a party hereto for the express purpose of relinquishing any debts which any of the parties of the second part may owe to it and a like relinquishment of its debts by the parties of the second part. IT IS FULLY UNDERSTOOD AND AGREED by all the parties to this indenture that any money or monies owed by any of the parties of the second part to any of the parties of the first part are hereby cancelled and declared to be satisfied and no longer owing. The terms and *134 provisions herein contained constitute the entire agreement between the parties and shall supersede all previous communications, representations, or agreements, either verbal or written, between the parties hereto with respect to the subject matter hereof. This contract shall be binding on the parties hereto, their heirs, successors and assigns. The effective date of this contract shall be May 19, 1958. This contract shall be governed by the laws of the State of North Carolina, both as to interpretation and performance. IN TESTIMONY WHEREOF, the parties hereto have hereunto set their hands and seals as individuals and as partners, and each corporate party hereto has caused this indenture to be executed in its name by its duly authorized officers and attested by its Secretary, and its corporate seal hereto affixed, all by order of its Board of Directors duly given, as of the day and year first above written. BLACKWELDER TEXTILE COMPANY, INC. By /s/ A. S. Harrill Vice-President ATTEST: /s/ Joseph J. Immerman Secretary IMMERMAN BROTHERS, INC. By /s/ Joseph J. Immerman President ATTEST: [Signature illegible] Secretary /s/ Joseph J. Immerman (SEAL) Joseph *135 J. Immerman H. AND H. HOSIERY MILL By /s/ A. S. Harrill (SEAL) Andrew S. Harrill - Partner By /s/ Gordon Holler (SEAL) Gordon Holler - Partner HARRILL YARN COMPANY By /s/ A. S. Harrill President ATTEST: /s/ Arthur Harrill Secretary HARRILL INSURANCE AGENCY By /s/ A. S. Harrill (SEAL) Andrew S. Harrill - Partner By /s/ Arthur Harrill (SEAL) Arthur Harrill - Partner LAUREL HILL TEXTILE SHOP By /s/ A. S. Harrill (SEAL) Andrew S. Harrill - Partner By /s/ Joseph J. Immerman (SEAL) Joseph J. Immerman - Partner By /s/ A. S. Harrill (SEAL) Andrew S. Harrill - Partner /s/ Sadie J. Harrill (SEAL) Sadie J. Harrill [Notary's certificates of acknowledgement omitted.] As stipulated by the parties hereto, H. and H. Hosiery Mills, Harrill Yarn Company, Inc., and Harrill Insurance Agency are, in fact, sole proprietorships owned and operated by petitioner. Pursuant to the above agreement of June 6, 1958, petitioner received from Blackwelder a series of fifteen non-interest bearing promissory notes in the amount of $1,000 each, aggregating $15,000, which were subsequently paid to petitioner by Blackwelder in full. Petitioner also received the *136 personal property and leasehold improvements used by Blackwelder in the operation of the ladies' hosiery division located at Rutherfordton, North Carolina, of which the following is a detailed inventory: Four (4) - Textile Machine Works, Reading 30 Section 51 gauge Full Fashion Hosiery Knitting Machines, Serial Nos. 13901, 15729, 13707, 13781, incl. motors and controls. Two (2) - Textile Machine Works, Reading 30 Section 66 gauge Full Fashion Hosiery Knitting Machines, Serial Nos. 18351, 18249, incl. motors and controls. Nine (9) - Union Special Machine Co. Style 43100 C. W. Sewing Machines, Serial Nos. 290834, 403920, 452943, 464888, 468539, 515637, 524968, 524969, and 549846, incl. pedestal base, motor treadle, thread stand and light. One (1) - Backus Machine Company Yarn Conditioning Box, incl. controls. Forty (40) - Industrial-type Florescent Light Fixtures. One (1) - Air Conditioning Unit consisting of: 1 - York 10 H.P. and 1 - 15 H.P. refrigerator compressors with air change unit, duct, piping and controls. Sprinkler System and Controls. Leasehold Improvements and Miscellaneous Minor Equipment comprising Knitter Cabinets, Mending Machines and Table, Electric Water *137 Cooler, Pairing Tables, Chairs, Portable Scale, Label Printer and other minor items. Office Furniture and Equipment comprising: 1 - Wood Secretarial Desk 2 - Wood Posture Chairs 1 - Monroe Electric Calculator 1 - Royal Typewriter 1 - Wood Double Pedestal Desk 1 - Clary Adding Calculator 2 - Wood Upholstered Arm Chairs 2 - 4-drawer Steel Letter Files and other minor items. The fair market value of the machinery and leasehold improvements transferred to petitioner by Blackwelder pursuant to the agreement of June 6, 1958, at the time of transfer, was $34,943.41. In reporting on their 1958 Federal income tax returns the amounts realized by them pursuant to the agreement of June 6, 1958, petitioners consulted R. C. Redding, a certified public accountant, as to how such amounts should be reported. The return is in accordance with the work papers prepared by Redding and was in fact prepared by him although he did not sign the return as the preparer. Opinion In order to determine the tax consequences to petitioners arising out of the settlement agreement dated June 6, 1958, it is first necessary to determine the aggregate amount received by petitioners. This aggregate *138 amount consists of three items: (1) the $15,000 in promissory notes which Blackwelder executed in favor of petitioner; (2) the $2,200.25 in rent owed by petitioner to Blackwelder which was cancelled; and (3) the machinery and improvements received by petitioner. [1] The notes were subsequently paid in full and the face amount thereof ($15,000) constituted income to petitioner in 1958, the year the notes were received by him. The $2,200.25 debt owed by petitioner to Blackwelder for the rental of machinery which was cancelled also constituted income in that amount to petitioner in 1958, the year it was cancelled. See United States v. Kirby Lumber Co., 284 U.S. 1; Commissioner v. Jacobson, 336 U.S. 28; Hash v. Commissioner, 273 F. 2d 248 (C.A. 4), affirming a Memorandum Opinion of this Court; Capitol Coal Corp., 26 T.C. 1183, affd. 250 F. 2d 361 (C.A. 2), certiorari denied 356 U.S. 936. We do not understand either party to contend otherwise as to either of these two items. There is disagreement as to the fair market value of the property received by petitioner on the date of transfer. Respondent contends that *139 the property had a fair market value of $40,899.63. Petitioner contends that the fair market value of the property on the date of transfer was not more than $34,943.41. The question is essentially one of fact. No specific appraisal was made by the parties of the value of the various items of machinery and improvements transferred, at the time the agreement of June 6, 1958 was executed, and no bill of sale, invoice, or other document was executed placing a value on the various items separately or collectively. Nor has either party offered any satisfactory expert testimony as to the value of such property. Respondent did not offer the testimony of any expert witness, and the testimony of petitioner's expert witness Sharp, who had not seen or examined the property in question, was of too general a nature and inconclusive to merit consideration herein. The $40,899.63 value contended for by respondent is admittedly a "computed" or "balancing figure" which respondent's *140 agent computed by deducting the amount petitioner owed Blackwelder from the amount Blackwelder owed petitioner and from the net amount owed to petitioner (which he computed to be $55,899.63) deducting $15,000, the face amount of the notes received by petitioner. Respondent argues that "In the absence of a fixed value, it is patently proper to indulge in the practical assumption that one holding enforceable claims against a debtor does not ordinarily relinquish these for less than his money's worth" and accordingly, that "the fair market value of the property transferred on June 6, 1958, was at least $40,899.63." Needless to say, we cannot accept such an assumption as a substitute for more positive evidence of the fair market value of the property in question. Moreover, the $40,899.63 value now contended for by respondent is considerably at variance with the $22,852.49 basis used by respondent in the statutory notice of deficiency for computing the amount of the deduction allowable to petitioner for depreciation. Respondent's explanation that the lesser basis was used in the statutory notice for protective purposes due to other proceedings then pending involving related petitioners *141 is, to say the least, not satisfactory. In each of their returns for the taxable years 1958 and 1959 petitioners separately valued each of the items of machinery and improvements received by them under the agreement of June 6, 1958, for depreciation purposes. The aggregate of such values was $34,943.41. Petitioner testified these values were high but he has conceded herein that the fair market value of such property on the date of transfer "may be as high as $34,943.41." The certified public accountant who prepared each of these returns testified the valuations shown thereon were arrived at in part on the basis of the depreciated values shown on previous audit reports of Blackwelder, in part on the basis of subsequent sales in early 1959 of some of the equipment and from discussion of the market for such equipment with petitioner. No presumption of correctness as to respondent's determination may be indulged in since respondent is here seeking a higher valuation than that set forth in his notice of deficiency. The burden is on respondent to establish the valuation here claimed by him. We do not think he has done so. We might further add that we find no merit in respondent's suggestion *142 that "good will" resulting from the fact that the machinery and equipment was then being used in a "going concern" is a factor to be considered in evaluating the property transferred. This suggestion is apparently related to the fact that the property transferred was the same property which was being rented and used by petitioner in the operation of the H. & H. Hosiery Mill. This was petitioner's business, not Blackwelder's. Any "good will" that attached to that business was petitioner's. Hlackwelder had no saleable or transferable interest in such good will; it was transferring machinery and equipment, not a "going business." In the absence of more precise evidence, we have found as a fact, and now hold, that the fair market value of the property in question on the date of transfer was $34,943.41, and that the aggregate amount received by petitioners as the result of the agreement of June 6, 1958, was $52,143.66. The next problem we have to consider is the allocation to be made of the aggregate amount received by petitioners under the agreement of June 6, 1958, the amounts thereof which constituted the return of capital, and is therefore nontaxable, and the amount, if any, which *143 is taxable as ordinary become. Petitioners contend that the amount received is to be allocated first to the capital items and then to the income items included in the obligations owed to petitioners which were satisfied or cancelled. Such an allocation, petitioners argue, would be in accordance with the intentions of the parties at the time the agreement of June 6, 1958, was negotiated and consummated. The agreement itself, however, contains no provisions as to how the amounts to be received by petitioners were to be allocated and we are not convinced from the evidence presented that the question of allocation was considered by petitioners prior to the execution of the agreement or, in fact, until they consulted with their certified public accountant with respect to the preparation and filing of their income tax return for 1958. Alternatively, petitioners contend that the amount received by petitioners should be allocated proportionately between capital and income items. Respondent, on brief, has agreed that such an allocation is necessary, if the value of the property received by petitioners was less than $40,899.63. We have found that the amount received by petitioners was $34,943.41 *144 and agree that such amount is to be allocated proportionately between the capital and income items included in the obligations owed to petitioners by Blackwelder which were satisfied or cancelled. This brings us to a consideration of the nature and amount of the claims or obligations included. Cf. Spangler v. Commissioner, 323 F. 2d 913, 916 (C.A. 9), affirming a Memorandum Opinion of this Court. Petitioners contend that the $50,000 unpaid balance owed them by Immerman upon the sale of their stock in Blackwelder is to be included in the capital items for which an allocation should be made. We do not agree. This was an obligation owed by Immerman individually. Blackwelder did not endorse or guarantee the payment of the notes and did not otherwise assume this obligation. Blackwelder and petitioners are separate and distinct taxable entities or individuals and the mere fact that the cancellation of this obligation was included in the agreement of June 6, 1958, is not sufficient to make it includable in the obligations for which any portion of the amount received by petitioner from Blackwelder is to be allocated. Both parties concede, and we think correctly so, that *145 the $30,000 loan made by petitioner to Blackwelder is to be treated as a capital item for allocation purposes. They are also apparently agreed that the remaining items, representing accrued salaries, commissions and finishing work, as well as insurance premiums advanced, are to be treated as ordinary income items. We are agreed as to all such items except the item of $6,190.33 representing insurance premiums advanced. Although the status of this item has not separately been discussed by either party it is our opinion that it represents a capital expenditure and is to be so treated in the allocation. As we understand the stipulation and the testimony this represents insurance premiums which the Harrison Insurance Agency advanced on behalf of Blackwelder and was therefore in the nature of a loan by petitioner's sole proprietorship to Blackwelder. In summary, we hold that of the $52,143.66 received by petitioners pursuant to the settlement agreement of June 6, 1958, 36,190.33/57,195.10ths represents the nontaxable recovery of capital and 21,004.77/57,195.10ths represents and is taxable as ordinary income. As hereinbefore indicated, respondent has conceded that the adjustment to petitioners' *146 taxable income for capital gains in the amount of $17,968.75, as set forth in the statutory notice, was erroneous. Instead he says that petitioners sustained a nonbusiness bad debt by reason of the unpaid balance in the amount of $50,000, owed to petitioners by Immerman on a promissory note, having become worthless in the year 1958. In view of respondent's concession we make no determination with respect to the capital gain adjustment. [2]
*147 Notwithstanding respondent's proffered concession (which was rejected by petitioners, apparently because of their contentions regarding the allocation of the amount received by them), we do not agree that petitioners have been shown to have suffered a nonbusiness bad debt loss by reason of the cancellation of the unpaid balance of the purchase price of their stock. Had they chosen to do so they could have recovered possession of the stock which was held in escrow, and again, although there is some suggestion that Blackwelder was insolvent, the record is not sufficient to establish this as a fact. Petitioners, on brief, concede that they are entitled to depreciation on the property received from Blackwelder only for the portion of the taxable year remaining after June 6, 1958. They have offered no evidence as to the useful lives of the various items of machinery and equipment included in such property. In accordance with our holding regarding the fair market value of such property, we hold that petitioners are entitled to a deduction for the depreciation of the property in question only for the portion of the taxable year remaining after June 6, 1958, based on useful lives of such *148 property as determined by respondent and a basis or cost in the aggregate amount of $34,943.41. The individual basis or cost of the various items may be computed under Rule 50 in accordance with the itemization set forth in petitioners' return. The final issue is whether petitioners are liable for additions to tax under section 6653(a) of the Internal Revenue Code of 1954. This section provides: SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. - If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. Prior to filing the return for 1958 petitioner consulted, and the return was in fact prepared by, a certified public accountant. We hold that petitioners were not negligent and did not intentionally disregard the rules and regulations and, accordingly, are not liable for *149 additions to tax under section 6653(a). Decision will be entered under Rule 50. Footnotes
1. Certain other obligations owed to or by petitioners were mentioned in the testimony of respondent's agent. The evidence concerning these items was too indefinite or uncertain, however, to justify their consideration.↩
2. In this connection, however, it might be noted that the cancellation of indebtedness on the purchase price of property which has depreciated in value below the amount of the outstanding indebtedness has been held to constitute a reduction in the purchase price of the property. Hirsch v. Commissioner, 115 F. 2d 656 (C.A. 7), reversing 41 B.T.A. 890; A. L. Killianco., 44 B.T.A. 169, which followed Hirsch v. Commissioner, supra, affd. 128 F. 2d 433 (C.A. 8); Gehring Publishing Co., 1 T.C. 345; Harold Wener, 24 T.C. 529, affd. 242 F. 2d 938↩ (C.A. 9). It is also to be noted that prior to 1958 petitioners had received $30,000 on the purchase price of their stock, which was in excess of their basis ($22,500), and there is some indication, though not clearly established, that they may have reported a portion of such payments as capital gain in their previous returns.